UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| THE CITRI-LITE COMPANY, a California corporation<br><br>                    Plaintiff,<br><br>          v.<br><br>COTT BEVERAGES, INC., dba Cott Beverages U.S.A., a Florida corporation, and DOES 1 through 25,<br><br>                    Defendants. | 1:07-CV-01075-OWW-DLB<br><br>MEMORANDUM DECISION RE: DEFENDANT'S MOTION FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, PARTIAL SUMMARY JUDGMENT (DOC. 36) |

## I.  INTRODUCTION

Before the court is a motion for summary judgment or, in the alternative, partial summary judgment brought by Defendant Cott Beverages, Inc. ("Cott").  The motion is directed at the claims for breach of contract and breach of the implied covenant of good faith and fair dealing asserted by Plaintiff The Citri-Lite Company ("Citri-Lite").

In this removed diversity action, Citri-Lite contends that Cott breached its contractual obligation to use "commercially reasonable efforts" to promote and sell "Slim-Lite," a beverage that Citri-Lite created.  In Cott's summary judgment motion, Cott argues that, under a proper interpretation of the contract, it satisfied its obligation to use commercially reasonable efforts to promote and sell Slim-Lite.  Alternatively, Cott argues that Citri-Lite cannot establish that its purported damages were caused by any breach by Cott, and that Citri-Lite's damages theories are "legally

1

unsound."   The following background facts are taken from the parties' submissions in connection with the motion and other documents on file in this case.[1]

## II.   BACKGROUND

### A.   The Parties

Cott is a Georgia corporation with its principal place of business in Tampa, Florida.  (Doc. 40 at 2.)  Cott produces and distributes non-alcoholic beverages including carbonated soft drinks, sparkling and flavored mineral waters, energy drinks, juice drinks, ready-to-drink teas, and other non-carbonated beverages. (*Id.*) Citri-Lite is a California corporation with its principal place of business in Grass Valley, California. (*Id.*)  Citri-Lite incorporated in 1996 to produce and market Slim-Lite, a non-carbonated, zero calorie, fruit-flavored drink. (*Id.* at 2-3.) Between 1996 and 2002, Citri-Lite operated at a loss. (*Id.*)

### B.   The Licensing Agreement

On December 28, 2003, Citri-Lite and Cott entered into a written agreement entitled "Intellectual Property License And Purchase Option Agreement" ("Agreement"), which is governed by California law. (Doc. 17 at 6; Doc. 40 at 3.)  The initial term of the Agreement is two (2) years, starting on December 28, 2003, with automatic two-year extensions. (*Id.*)  Under Section 8.1, however,

---

[1] "A district court does not . . . make 'findings of fact' in ruling on a summary judgment motion. Findings of fact are made on the basis of evidentiary hearings and usually involve credibility determinations." *Rand v. Rowland*, 154 F.3d 952, 957 n.4 (9th Cir. 1998); *see also Scott v. Harris,* 550 U.S. 372, 378 (2007) ("As this case was decided on summary judgment, there have not yet been factual findings by a judge or jury . . . ."); *Cottrell v. Caldwell*, 85 F.3d 1480, 1486 (11th Cir. 1996).

1  Cott had the right to terminate the Agreement at any time upon
2  sixty (60) days prior written notice. (*Id.*; Doc. 40 at 4.)[2]

3       Under the terms of the Agreement, Citri-Lite granted Cott the
4  exclusive right to use the Slim-Lite® brand identity and all
5  associated intellectual property rights, as defined by the
6  Agreement, for purposes of the manufacture, production,
7  distribution, sale and marketing of Slim-Lite. (Doc. 17 at 6.)   In
8  exchange, Cott agreed to make royalty payments to Citri-Lite based
9  on a rate of fifty cents ($0.50) per case of product sold (i.e.,
10  fifty cents per 240 ounces of the product sold by Cott), with a
11  guaranteed minimum royalty of $350,000 per year. (*Id.*; Doc. 40 at
12  4.)[3]

13       The Agreement also contained a clause which required Cott to
14  spend a certain amount to market Slim-Lite and to "otherwise use
15  commercially reasonable efforts to promote and sell" Slim-Lite "so
16  as to maintain and enhance the value of the goodwill" inhering in
17  Slim-Lite® and "produce the maximum amount of" royalty under the
18  Agreement:

19       **2.4. Licensee's Effort To Sell.**   During the Term, the
         Licensee will spend on average over each rolling twelve
20       (12) month period during the Royalty Term the sum of
         Eight Cents ($.80) per Case of Product sold by Licensee
21       during such rolling twelve (12) month period to market
         the Products. *Licensee shall otherwise use commercially*
22       *reasonable efforts to promote and sell the Products* so as
         to maintain and enhance the value of the goodwill
23       residing in the Intellectual Property and to produce the

24

25       [2] Section 8.2 additionally gives "Either party," not just
26  Cott, an ability to terminate the Agreement under specified
    circumstances.

27
28       [3] The $0.50 per case royalty amount was pro-rated if other
    configurations of the product were sold. (Doc. 40 at 5.)

**3**

maximum amount of Royalty under this Agreement consistent with the quality control provisions of this Article 2.

(Doc. 38, Ex. 3 at 4) (emphasis added.)   The "Royalty Term" is defined in the Agreement as "any one-year period during which this Agreement is in effect commencing on the Effective Date [December 28, 2003] or an anniversary of the Effective Date." (*Id.* at 2.) The term "Case" is defined as the "quantity of twelve (12) containers of the product, where each container holds twenty (20) ounces or any configuration of containers." (*Id.* at 2.)   The term "Products" means the "the non-carbonated, zero calorie soft drink marketed and sold by Licensor under the name SLIM-LITE® and/or that contains Citrimax and/or ChromMate." (*Id.*)   The term "commercially reasonable efforts" is not defined in the Agreement and the Agreement did not identify specific marketing efforts which were required of Cott. (Doc. 40 at 6.)

The Agreement gave Cott an option to purchase the exclusive distribution and marketing rights, including numerous intellectual property rights, associated with Slim-Lite for a price of one million dollars ($1,000,000) with certain continued payments to Citri-Lite – "forty (40) cents per Case of Products sold" - for a period of ten years. (Doc. 17 at 7.)

C.   Cott's Selling And Promoting Of Slim-Lite

   1.   Overview

When Cott entered into the Agreement with Citri-Lite, 248 Sam's Club stores (or clubs) carried Slim-Lite. (Doc. 40 at 13.) In 2004, during the first year of the Agreement, the sales volume of Slim-Lite increased and more Sam's Clubs began carrying Slim-Lite than ever before. (Doc. 40 at 13, 17, 45-46.)   Despite what

4

appeared to be a successful first year, by May 2005 Cott began considering an "exit strategy" for Slim-Lite. (Doc. 45, Ex. 143; Doc. 42 at 29).  By October 2005, less than two years into the Agreement, Cott informed Citri-Lite that it wanted to terminate the Agreement. (Doc. 40 at 52-53).  According to Citri-Lite, before the Agreement ended, Cott mishandled the marketing of Slim-Lite in at least three ways, breaching its commitment to use "commercially reasonable efforts" to promote and sell the product.

First, in 2004, after Cott took over Slim-Lite, it continued Citri-Lite's practice of conducting in-store demos of Slim-Lite at Sam's Club.  In 2005, however, Cott reduced and then stopped all of its demo activity at Sam's Club.  According to Citri-Lite, this slow down and termination of demo activity negatively impacted Slim-Lite's success at Sam's Club.

Second, toward the end of 2004, Cott was developing a "repackaging strategy" for Slim-Lite as part of a major initiative aimed at solidifying long term distribution of Slim-Lite in Sam's Club and Walmart.  Cott, however, failed to actually implement the repackaging change despite recognizing its importance to Slim-Lite's success and despite Sam's Club's request that it be done.

Third, while focusing its energy on Sam's Club and Walmart, Cott neglected other retailers, including Food Lion, another merchandiser of Slim-Lite.  According to Citri-Lite, Cott did not develop any particular marketing plan for Food Lion and did not engage in sufficient promotional activity at Food Lion.

    2.  **Efforts At Sam's Club**

        a.  **The Buyers**

During the time Cott marketed Slim-Lite at Sam's Club, it

**5**

worked with two Sam' Club buyers: Jim Dragovich and Becky Fields. Both Dragovich and Fields had discretion to modify the distribution of beverages under their respective categories, and both had the discretion to cancel beverages in their categories. (Doc. 40 at 9-10, 12.)

### b.   Demos And Packaging Changes

In 2004, Cott promoted Slim-Lite at Sam's Club through in-store demos.   (Doc. 40 at 37.)   Sam's Club used its own employees to run the in-store demos and charged the vendor (Cott) approximately $150 per demo in each store. (*Id*. at 13.) Sam's Club also charged the full retail price for the products used in demos, thus requiring the vendor to purchase their own sampled products. (*Id.*) Demos of Slim-Lite initially led to an approximate 20% increase in sales during demo weeks.   (*Id.*)   Cott spent over $800,000 for Slim-Lite demos at Sam's Clubs in 2004. (*Id.*)

Apart from promoting the product through in-store demos at Sam's Club, by September 2004, Cott employees developed a plan to change the packaging of Slim-Lite to a 24-pack containing 16.9 ounce bottles with registered shrink wrap. (*Id.* at 24, 27.)   At the time, Cott was selling Slim-Lite to Sam's Club in a 12-pack containing 20 ounce bottles with transparent clear shrink wrap. (Schiederer Dep. 59:24-60:3; Doc. 36 at 7.)   Cott was "seeing a movement toward 16.9oz as the preferred serve size from several competitors – a trend for the category as a whole." (Doc. 47, Ex. 17.)

Sam's Club regularly worked with suppliers, like Cott, to determine what kind of packaging to use for their products and, according to Dragovich, the idea for Slim-Lite's packaging change originated from Sam's Club. (Dragovich Dep. 42:17-20, 79:19-22.)

**6**

A 16.9 ounce bottle was a "focus" for Sam's Club as they were "trying to line up 16.9 ounce [bottles] [for] all our beverages." (Dragovich Dep. 76:4-8; 79:19-22.)  Further, according to Dragovich, "tuxedo wrap, the four-color, high graphic wrap was something we were asking our suppliers to look at as well because it promoted their product much better and where we made those changes, we saw increases in sales." (Dragovich Dep. 76:9-13.)  Dragovich believed that Cott's packaging change would improve Slim-Lite's marketability at Sam's Club. (Dragovich Dep. 141:10-142:8.)   Cott hoped to introduce the packaging change by January or February 2005.  (Doc. 40 at 27.)

While the packaging plans were underway, in November 2004, Cott submitted to Sam's Club a 2005 demo plan for Slim-Lite.  (Doc. 42 at 16.)  This plan reduced in-store demos to only one demo per month per store in 2005. (Doc. 42 at 16.)[4]   Shortly thereafter, on December 07, 2004, Gilbert Woods, Cott's Senior Manager for Sales and Finance, sent an internal e-mail to Jason Nichol of Cott.  In

_____

[4] According to George Horrigan, Citri-Lite's president, at the time Slim-Lite was transferred to Cott, Citri-Lite's plan for demos at Sam's Club called for two demos per month per club.  As to clubs at which Slim-Lite was new, Citri-Lite increased demos to once a week for the first two months, dropping down to two demos per month per club thereafter. (Horrigan Decl. ¶¶ 6, 9.)  Although this was Citri-Lite's protocol for demos, Horrigan conceded that "deviations from the protocol could and did occur." (Horrigan Decl. ¶ 9.)  Horrigan recognized that "you[']r[e] at their [Sam's Club's] mercy" in terms of arranging demos, and it appears no demos were conducted at Sam's Club in February 2003. (Horrigan Dep. 202:13-19, 204:2-2.)  According to Jason Nichol, Cott's Vice President of Customer and Business Development, Citri-Lite had been conducting demos "very regularly" and Cott tried to continue the demoing when Cott took over Slim-Lite. (Nichol Dep. 38:2-4.)

7

the e-mail, Woods indicated that he wanted to cancel altogether in-club demos for Slim-Lite. (Doc. 45, Ex. 64.)

On January 3, 2005, Charles Calise, Cott's Marketing Manager, e-mailed George Horrigan, Citri-Lite's president, regarding Cott's new packaging plan and other details of Cott's "major initiative at solidifying long term distribution of Slim-Lite in SAMS Club Walmart."  Calise's e-mail states:

> Happy New Year George,
>
> We appreciate your perspective on the 1L option for Slim-Lite. We continue to evaluate the feasibility of this and other opportunities that will help ensure the long term success of the Slim-Lite brand.
>
> As you know we are in the midst of a major initiative aimed at solidifying long term distribution of Slim-Lite in SAMS Club and Walmart. This initiative involves:
>
> • refreshing labels and trays for legal and regulatory compliance
> • launching a 16.9oz line extension to better align with category trends
> • transitioning business from the 20oz format to the 16.9oz format
> • executing a packaging re-design to help improve pallet merchandising, billboard and consumer appeal
> • managing pricing
> • increasing promotional/demo activity[5]
>
> We agree with you that Slim-Lite needs distribution beyond Walmart and SAMS Club. As such, we continue to pursue distribution for Slim-Lite around the country through both our Alternative Channels team and our Retailer Specific teams. However, . . . Walmart and SAMS continue to represent the pinnacle for awareness, recognition and sales velocity for any brand that aspires to be a national player. We this in mind, we feel it is critical that we remain focused, continue to pursue our current initiatives and concentrate on activities that

---

[5]  Calise's e-mail states that part of Cott's "major initiative" for Slim-Lite involved *increasing* "promotional/demo activity."  At the same, Woods' prior e-mail to Nichol indicated that Cott was seeking to cancel Slim-Lite demo activity at Sam's Club.

**will help ensure the success of Slim-Lite within Walmart and SAMS.   Once we are confident that the brand is secure with these two key customers, we can then turn our attention toward additional line extensions, etc.**

(Doc. 38, Ex. 32.)[6]

Later that same month (January 2005), Cott's management did not approve of the anticipated packaging change.

In particular, Woods rejected the packaging change purportedly "based on less than acceptable gross margins at [the] suggested list price to Sam's." (Doc. 38 at 93.)   Woods stated that he would reconsider the packaging change if: (1) Cott could obtain a higher price for Slim-Lite; (2) manufacturing costs could be lowered; (3) freight costs could be reduced by finding a repackaging location closer to Cott production facilities; and (4) Cott could obtain a reduction in the required demo spending.   (Doc. 40 at 30-31.) Approximately a week later, Woods received revised information on manufacturing costs which were lower.   If combined with a reduction in demo spending to $0.55 per 24-pack case, Woods indicated that the resulting increase in gross margin would enable him to reconsider the proposed packaging change for final approval. (*Id.* at 31.)

By February 2005, Citri-Lite and Cott were discussing amending the Agreement. (Doc. 45, Ex. 189.)   Cott prepared a draft amendment, which memorialized the concessions Cott wanted. (Doc. 45, Ex. 94; Doc. 42 at 22.)   Cott obtained Horrigan's verbal approval to the substance of the amendment, but apparently Cott failed to follow through and the written amendment was never executed. (Doc. 42 at 17, 22; Horrigan Decl. ¶ 35.)

---

[6] **According to Horrigan, he never agreed to focus promotional efforts solely on Wal-Mart and Sam's Club. (Horrigan Decl. ¶ 29.)**

### c.   The Decline Of Slim-Lite At Sam's Club

When Cott entered into the Agreement with Citri-Lite, 248 Sam's Club stores (or clubs) carried Slim-Lite. (Doc. 40 at 13.)   In December 2004, Slim-Lite's distribution at Sam's Club reached a high of 528 clubs. (*Id.*)   Between December 2004 and March 2005, however, with the demos reduced (as of 2005) and the packaging change still unrealized, Slim-Lite's distribution at Sam's Club declined from 528 clubs to 463 clubs. (*Id.* at 46.)   In March 24, 2005, Cott, via e-mail, notified Sam's Clubs that it was cancelling all remaining Slim-Lite demos (*Id.* at 24.)[7]   Around the beginning of April 2005, Sam's Club cut the distribution of Slim-Lite even further from 463 stores to 89 stores. (*Id.* at 46.)   The last demos at Sam's Club were conducted on or about the end of April 2005. (Id. at 22, 24.)

As the distribution decreased, Cott scheduled a "Leadership Team meeting" for April 12, 2005, to "decide upon the future of SlimLite." (Doc. 45, Ex. 99.)   Cott's Vice President of Finance, Conall Dunne, questioned whether Cott "really want[ed] to pursue this 'licensed' brand" and whether Cott could produce Slim-Lite efficiently. (*Id.*)   By May 23, 2005, Cott considered an "exit strategy" for Slim-Lite.   An internal e-mail dated May 23, 2005, from Doreen Gormley, Cott's Vice President of Marketing, to several Cott employees, reads:

Team:

We agreed in our Product Review meeting that we would review our current situation with SlimLite to develop an exit strategy for the brand. We had meetings/discussions with Steve Olinger, Matt, Jason & Rob Schiederer to

---

[7]   Apparently, Cott believed demos were costly and did not produce a long-term sustained sales increase. (Doc. 36 at 6.)

discuss options/issues. Charles Calise then compiled a comprehensive situational analysis to assist in determining our next steps . . . .

Bottom line is that there is agreement by Steve O. and Jason to transition out of the brand, but we have a significant amount of raws that must be depleted first . . . . We will need to be creative and aggressive in finding ways to sell these goods and/or transfer them to the new supplier but it will require a collaborative effort with the Licensor (George Horrigan) to discount the goods and/or sell them elsewhere. We also want to hold onto our Sam's Club volume as long as feasible.

George Horrigan's expectation is that we are building the brand and aggressively pursuing new volume. Now that we have all the information, our recommendation is to now contact George and advise him that we would like to develop an exit strategy for the brand and solicit his assistance in depleting the raws and/or working with a new supplier to absorb some of the raw materials (some are obsolete so we would have to look for solutions to sell through quickly). We will also ask for Matt's assistance in negotiating a reduced full year royalty rate if possible.

Before we contact George and formally advise him of our request to exit the agreement and ask for his assistance, I wanted everyone to [be] aware of this strategy in case there are any issues/concerns. There is some risk of losing the Sam's volume quicker than anticipated and/or if he does not agree to help with the depletion of the raw materials. However, there may be a great risk if we don't start the process of working through the issues asap. I think he'll be reasonable so we [would] like to get the dialogue started this week. We will ensure that Matt is involved throughout the entire process.

Please advise if you're [in] agreement with this approach or if you have other recommendations.

(Doc. 45, Ex. 143.)

Charles Calise, along with others from Cott, had a conference call with Horrigan on June 10, 2005. (Doc. 45, Ex. 70)  According to Horrigan, during the call, he learned for the first time that Cott had reduced demos at Sam's Club to once a month and that fewer than 90 Sam's Clubs were carrying Slim-Lite. (Horrigan Decl. ¶ 39.) According to Horrigan, Cott did not inform him of Cott's decision

11

to cancel the demos at Sam's Club or inform him of any plan to exit the Agreement. (*Id.*) Cott personnel indicated they would endeavor to increase the distribution of Slim-Lite back to the original 248-club level. (*Id.*)  According to Horrigan, they discussed the need to repackage the product and Horrigan learned for the first time that this had not already been accomplished. (*Id.*)

After the cut in distribution, Fields (the Sam's Club buyer) informed Rob Scheiderer, Cott's Director of Sales, that the club count would not be re-established until the packaging change was made and the newly configured product proved itself in existing clubs. (Schiederer Dep. 322:16-20.)  Ultimately, however, Cott did not implement the packaging change and the distribution never returned to 248-store level, *i.e.*, the original level of distribution at the beginning of the Agreement.  (Doc. 40 at 52.)[8]

In October 2005, Cott notified Citri-Lite that it was exercising its right to terminate the Agreement, effective December 31, 2005. (*Id.* at 52-53.)  Once the Agreement ended, Cott provided Citri-Lite with the design files it developed for the proposed 24-pack, 16.9 ounce package. (*Id.* at 53-54.)  After the Agreement ended, Citri-Lite continued to sell Slim-Lite at Sam's Club until 2008, when Sam's Club discontinued the product. (Doc. 40 at 55.)

3.  Efforts At Food Lion

A food broker called Crossmark, and one of its agents, Michael

---

[8]  Incidentally, Cott did introduce a 24-pack of 16.9 ounce bottles in Wal-Mart. (Doc. 42 at 21.)  Cott claims, however, that it did not implement the packaging change with respect to Sam's Club primarily because of "costs and production capacity" issues. (Doc. 36 at 19-20; *see also* Nichol Dep. 57:24-58:8.)

McGlothin, initially helped Citri-Lite get Slim-Lite into Food Lion. (Doc. 42 at 7-8.)  When Cott entered into the Agreement with Citri-Lite and Cott began distributing Slim-Lite, 800 Food Lion stores carried the product. (Doc. 40 at 30.)

Before Cott's involvement with Slim-Lite, Horrigan had previously negotiated that Slim-Lite be sold to Food Lion at $10.20 per case. (*Id.* at 9.)  According to Cott, "[a]s a result of this [prior] pricing agreement and Cott's marketing expenditures at Sam's, Cott had no funds available for promotion at Food Lion pursuant to ¶ 2.4 of the Agreement." (Doc. 40 at 42.)  Cott did not develop any particular marketing plan for Food Lion. (Doc. 42 at 28.)

According to an e-mail from Larry Thompson, Cott's Food Lion account manager, to Calise, despite the lack of promotional funds, Cott conducted a promotion at Food Lion in the Summer 2004 and obtained some "wing displays":

> Please note that no marketing funds are available as George sold Slim Lite to Food Lion at a dead net cost of $10.20 – per Food's Lion's wishes. Food Lion's thinking was the product was so unique that offering an EDLP [every day low price] and good shelf position would move the cases. Never the less (sic), we did support a promo summer of 2004 that got us $1.99 retail and wing displays in all stores . . . .

(Doc. 45, Ex. 33.)  In his deposition, Thompson explained that "dead net cost" means "that there are no marketing funds available. And if they asked us for money, we'll tell them to drop dead. I mean, no. No marketing funds available" and it has "[n]othing to do with profit margin." (Thompson Dep. 93:23-94:7.)  After Cott ran the summer promo in 2004, McGlothin urged Thompson to run more demos, but Thompson responded that he was not authorized to approve the

13

funding. (McGlothin Dep. 35:19-36:16.)

In January 2005, Calise sent an e-mail to Horrigan, set forth above, in which Calise discussed Cott's major initiative aimed at solidifying long term distribution of Slim-Lite in *Sam's Club* and *Walmart* and informed Horrigan of Cott's intent to focus on those retailers. (Doc. 38, Ex. 32.)[9] In March 2005, due to poor performance, Slim-Lite was removed from 489 smaller Food Lion stores. (Doc. 40 at 44.)  Again, in October 2005, Cott notified Citri-Lite that it was exercising its right to terminate the Agreement, effective December 31, 2005. (*Id.* at 52-53.)  There is no indication in the record that prior to ending the Agreement with Citri-Lite, Cott was able to regain the lost distribution at Food Lion.

D.   Citri-Lite's Claims And Damages Theories

Citri-Lite's complaint against Cott asserts two claims: breach of contract and breach of the implied covenant of good faith and fair dealing.  In its breach of contract claim, Citri-Lite alleges that Cott breached its contractual obligation to "use commercial reasonable efforts to promote and sell" Slim-Lite.  (Doc. 2, Ex. A at 7.)  In its implied covenant claim, Citri-Lite alleges, among other things, that Cott "failed to give Citri-Lite's interests as much consideration as its own." (*Id.* at 8.)   In its complaint, Citri-Lite seeks no less than $6,400,000. (*Id.* at 9.)

Citri-Lite has set forth damages computations in the export reports of Thomas Neches. (Doc. 38, Ex. U; Neches Decl., Exs. 1-3.)

---

[9]  According to Horrigan, he never agreed to focus promotional efforts solely on Wal-Mart and Sam's Club. (Horrigan Decl. ¶ 29.)

14

Neches has calculated Citri-Lite's economic damages based upon the assumption that Cott failed to use commercially reasonable efforts. In his report, Neches calculates Citri-Lite's claimed lost profit (or "but-for royalties") based on the projected sales of Slim-Lite at Sam's Club that would have been realized "but for" Cott's alleged failure to use commercially reasonable marketing efforts. (Doc. 38, Ex. U at 3-7.) Neches presents three different damages scenarios, and each scenario has a "lower bound" and an "upper bound" of estimated damages.

In the first scenario, Cott renews the Agreement five times and continues selling Slim-Lite under the Agreement through 2015. In the second scenario, Cott exercises the purchase option and pays the purchase price of $1,000,000 in 2006, and continues selling Slim-Lite through 2015. In the third scenario, Cott terminates the Agreement in 2005, Citri-Lite sells Slim-Lite through 2015 and then Citri-Lite earns or sells the present value of future profits. (Doc. 38, Ex. U at 3-7.)[10] Under any of these three scenarios, Citri-Lite's purported lost profits is in the millions of dollars.

### III.   SUMMARY JUDGMENT STANDARD

"The standards and procedures for granting partial summary judgment, also known as summary adjudication, are the same as those for summary judgment." *Mora v. Chem-Tronics, Inc.*, 16 F. Supp. 2d 1192, 1200 (S.D. Cal. 1998). Summary judgment is appropriate when "the pleadings, the discovery and disclosure materials on file, and

---

[10] According to his report, Neches also prepared a substitute calculation that included potential lost profits with respect to Food Lion. Neches did not, however, calculate any lost profits with respect to WalMart.

any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56©.  The movant "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (internal quotation marks omitted).

With respect to an issue as to which the non-moving party will have the burden of proof, the movant "can prevail merely by pointing out that there is an absence of evidence to support the nonmoving party's case." *Soremekun v. Thrifty Payless, Inc*., 509 F.3d 978, 984 (9th Cir. 2007).  When a motion for summary judgment is properly made and supported, the non-movant cannot defeat the motion by resting upon the allegations or denials of its own pleading, rather the "non-moving party must set forth, by affidavit or as otherwise provided in Rule 56, 'specific facts showing that there is a genuine issue for trial.'" *Id*. (quoting *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 250 (1986)). "Conclusory, speculative testimony in affidavits and moving papers is insufficient to raise genuine issues of fact and defeat summary judgment." *Id*.   Likewise, "[a] non-movant's bald assertions or a mere scintilla of evidence in his [or her] favor are both insufficient to withstand summary judgment." *FTC v. Stefanchik*, 559 F.3d 924, 929 (9th Cir. 2009).

"[S]ummary judgment will not lie if [a] dispute about a material fact is 'genuine,' that is, if the evidence is such that

16

a reasonable jury could return a verdict for the nonmoving party."
*Anderson*, 477 U.S. at 248.   In ruling on a motion for summary
judgment, the district court does not make credibility
determinations; rather, the "evidence of the non-movant is to be
believed, and all justifiable inferences are to be drawn in his
favor." *Id.* at 255.[11]

## IV.  DISCUSSION AND ANALYSIS

A.   Breach Of Contract Claim – Commercially Reasonable Efforts

      In its moving papers, Cott argues that "under a proper
interpretation of 'commercially reasonable efforts,' Citri-Lite

---

[11] **Citing to an old Ninth Circuit case*, Neff Instrument Corp.
v. Cohu Electronics, Inc.*, 269 F.2d 668, 673-74 (9th Cir. 1959),
Citri-Lite contends that Cott has the "burden" of "establishing the
nonexistence of any genuine issue of fact."   More recent Ninth
Circuit authority explains that, on summary judgment, with respect
to an issue on which the non-moving party will have the burden of
proof at trial, "[t]he moving party bears the *initial burden* of
establishing the absence of a genuine issue of material fact," and
"[t]hat burden may be met by 'showing'– that is, pointing out to
the district court-that there is an absence of evidence to support
the nonmoving party's case." *Fairbank v. Wunderman Cato Johnson*,
212 F.3d 528, 531 (9th Cir. 2000) (emphasis added); *accord
Soremekun, Inc.*, 509 F.3d at 984; *Miller v. Glen Miller Prods,
Inc.*, 454 F.3d 975, 987 (9th Cir. 2006).   In other words, "a moving
defendant may shift the burden of producing evidence to the
nonmoving plaintiff merely by 'showing'-that is, pointing to
through argument-the absence of evidence to support plaintiff's
claim." *Fairbank*, 212 F.3d at 532.   Because Cott does not have the
burden of proof at trial on the issues raised in its briefing
(i.e., establishing Cott's alleged contractual breaches, causation,
and Citri-Lite's damages theories), to meet its initial burden on
summary judgment, Cott must simply point out the absence of
evidence supporting Citri-Lite's case on these issues.   If Cott
meets its initial burden, the burden is then on Citri-Lite to
demonstrate a genuine issue for trial. *Neff Instrument* cannot be
read to place a higher burden on Cott, the moving party, than more
recent cases like *Fairbank, Soremekun* and *Miller* establish.**

cannot establish breach." (Doc 36 at 19) (emphasis added.)  Both Cott and Citri-Lite advance their own views on the meaning of the term "commercially reasonable efforts" without providing any bright-line definition.[12]

"Under California law, the interpretation of a written contract is a matter of law for the court even though questions of fact are involved." *Southland Corp. v. Emerald Oil Co.*, 789 F.2d 1441, 1443 (9th Cir. 1986).  "It is solely a judicial function to interpret a written contract unless the interpretation turns upon the credibility of extrinsic evidence, even when conflicting inferences may be drawn from uncontroverted evidence." *Hess v. Ford Motor Co.*, 27 Cal. 4th 516, 527 (2002) (internal quotation marks omitted). "When no extrinsic evidence is introduced, or when the competent extrinsic evidence is not in conflict, the . . . court independently construes the contract," *Founding Members*, 109 Cal. App. 4th at 955, "according to the generally accepted canons of interpretation." *Martin Bros. Constr. v. Thompson Pac. Constr., Inc.*, 179 Cal. App. 4th 1401, 1416 (2009).[13]

"The fundamental goal of contractual interpretation is to give effect to the mutual intention of the parties." *Bank of the W. v. Superior Court*, 2 Cal. 4th. 1254, 1264 (1992).  "When a contract is reduced to writing, the parties' intention is determined from the writing alone, if possible." *Founding Members of the Newport Beach*

---

[12] A contracting party's "interpretation" of the contract is not the same thing as extrinsic evidence of intent. *Cal. Nat'l Bank v. Woodbridge Plaza LLC*, 164 Cal. App. 4th 137, 143 (2008).

[13] No party has pointed to a conflict in any extrinsic evidence.

*Country Club v. Newport Beach Country Club, Inc.*, 109 Cal. App. 4th 944, 955 (2003). "Unless the parties have indicated a special meaning, the contract's words are to be understood in their ordinary and popular sense." *Crawford v. Weather Shield Mfg., Inc.*, 44 Cal.4th 541, 552 (2008).

"If a contract is capable of two different reasonable interpretations, the contract is ambiguous." *Oceanside 84*, *Ltd. v. Fidelity Federal Bank*, 56 Cal. App. 4th 1441, 1448 (1997); *see also Cal. Nat'l Bank. v. Woodbridge Plaza LLC*, 164 Cal. App. 4th 137, 143-44 (2008) ("An ambiguity exists when a party can identify an alternative, semantically reasonable, candidate of meaning of a writing.") (internal quotation marks omitted). "The fact that a term is not defined in the [contract] does not make it ambiguous." *Muzzi v. Bel Air Mart*, 171 Cal. App. 4th 456, 462-63 (2009) (alteration in original) (internal quotation marks omitted). "Nor does [d]isagreement concerning the meaning of a phrase, or the fact that a word or phrase isolated from its context is susceptible of more than one meaning." *Id.* (alteration in original) (internal quotation marks omitted). "[L]anguage in a contract must be construed in the context of that instrument as a whole, and in the circumstances of that case, and cannot be found to be ambiguous in the abstract." *Powerline Oil Co., Inc. v. Superior Court*, 37 Cal. 4th 377, 391 (2005) (internal quotation marks omitted).

Whether a contract is ambiguous can be determined from the face of the contractual language or from extrinsic evidence of the parties' intent. *Oceanside 84, Ltd.*, 56 Cal. App. 4th at 1448; *Supervalu, Inc. v. Wexford Underwriting Managers, Inc.*, 175 Cal. App. 4th 64, 74 (2009). Under the latter approach, "[i]f the trial

19

court decides, after receiving the extrinsic evidence, the language of the contract is reasonably susceptible to the interpretation urged, the evidence is admitted to aid in interpreting the contract." *Founding Members*, 109 Cal. App. 4th at 955. Extrinsic evidence may resolve the ambiguity or it may not. If not, and if no other cannons of contract construction resolve the ambiguity, the contract may be construed against the drafter. *Oceanside 84, Ltd.*, 56 Cal. App. 4th at 1448.

In the briefing, the main dispute between Cott and Citri-Lite over the meaning of "commercially reasonable efforts" is whether this term allowed Cott to take into consideration its own business interests, including the "costs to Cott of such efforts" (Doc. 36 at 17), or whether Cott had to exert efforts to promote and sell Slim-Lite without regard to its economic business interests. According to Cott, the term "commercially reasonable efforts" allowed Cott "to take into account all pertinent economic factors, provided its eventual decisions reflected overall fairness both to itself and to Citri-Lite." (Doc. 36 at 16.) Under Cott's interpretation, the meaning of "commercially reasonable efforts" must be judged "in light of all the circumstances." (*Id.* at 18.) Citri-Lite, on the other hand, contends that the term "commercially reasonable efforts" does not permit Cott to take into account its "perceived economic self-interest" and has "*nothing* to do with Cott's business interests." (Doc. 41 at 12) (emphasis added.)

Citri-Lite's interpretation of the Agreement creates an absurdity and cannot be adopted. *County of Humboldt v. McKee*, 165 Cal. App. 4th 1476, 1498 (2008) ("[T]he court shall avoid an interpretation which will make a contract extraordinary, harsh,

unjust, inequitable or which would result in absurdity.") (internal quotation marks omitted); *Kassbaum v. Steppenwold Prods, Inc.*, 236 F.3d 487, 491 (9th Cir. 2000) (applying California law, stating "[w]e may not read the contract in a manner that leads to an absurd result"). Interpreting the term "commercially reasonable efforts" in the manner Citri-Lite suggests would require Cott to engage in promotional and selling efforts without any regard to its economic business interests, which it has a legal privilege to protect. *Gonsalves v. Hodgson*, 38 Cal. 2d 91, 99 (1951) ("There is no rule that parties to a contract may not act for their own interest during the execution of the contract.") (internal quotation marks omitted). Both parties obviously expected to mutually benefit from the Agreement and it is an absurdity to suggest a reasonable business entity would contractually obligate itself to operate without regard to its business interests.[14]

At oral argument on the motion, Cott recognized the difficulty in defining the term "commercially reasonable efforts" but, at a minimum, Cott argued that Citri-Lite's position on the meaning of the term should be rejected. Recognizing its stance was too extreme, at oral argument, Citri-Lite clarified (if not entirely changed) its position on the meaning of "commercially reasonable efforts." Citri-Lite conceded that Cott's business interests can be considered as *one* factor, among others, in assessing whether Cott used "commercially reasonable efforts." This concession avoids the

---

[14] While Citri-Lite points to some evidence on the circumstances purportedly surrounding the inclusion of the "commercially reasonable efforts" term, this evidence does not suggest that the parties intended the term to preclude consideration of Cott's business interests.

absurdity noted above and is consistent with the case law on commercially reasonable efforts.[15]

One California case which Cott cites, *Gifford v. J&A Holdings*, 54 Cal. App. 4th 996, 1005 (1997), defined "commercially reasonable effort" as that term is used in the uniform commercial code. *See* Cal. Com. Code § 6107© ("A buyer who made a good faith and commercially reasonable effort to comply with the requirements of Section 6104 or to exclude the sale from the application of this division under subdivision © of Section 6103 is not liable to creditors for failure to comply with the requirements of Section 6104. The buyer has the burden of establishing the good faith and commercial reasonableness of the effort."). The *Gifford* court, citing other UCC cases, stated "[c]ommercial reasonableness is not expressly defined in the statute, but has been defined elsewhere [in other cases involving the UCC] to include commonly accepted commercial practices of responsible businesses which afford *all* parties fair treatment." 54 Cal. App. 4th at 1005 (emphasis added). *Gifford* found that "commercial reasonableness primarily involve[s] questions of fact." *Id.* at 1006.

A more recent unpublished case from California, *Sempra Energy Resources v. California Department of Water Resources, No.* D043397, 2005 WL 1459950 (Cal. Ct. App. June 21, 2005), considered the meaning of the term "commercially reasonable efforts" in the

------

[15] In its moving papers, Cott notes that there is "sparse" case law on the term commercially reasonable efforts.

parties' "Energy Purchase Agreement."[16]   The court noted that the contract did not define the term, "nor is the term defined in the law." *Id.* at *9.   The court concluded that "[w]here, as here, the record presents a dispute as to whether a party acted in a commercially reasonable manner, the issue turns on factual questions of reasonableness under the circumstances and cannot be resolved on summary judgment." *Id.* at *9.   In a footnote, the court stated that "[a]lthough economic feasibility and profitability of a particular Project may be one circumstance of commercial reasonableness, other factors, particularly those in the electric generation industry, will be relevant to the determination." *Id.* at *9 n.12.

Another unpublished case from Ohio, *Castle Properties v. Lowe's Home Centers, Inc.*, No. 98 CA 185, 2000 WL 309395 (Ohio Ct. App. Mar. 20, 2000), analyzed a contract provision requiring the purchaser of land to use "*all* commercially reasonable efforts" to achieve certain objectives, including getting the land rezoned. Rejecting the argument that the term "all commercially reasonable efforts" was ambiguous, the court stated:

> Although no Ohio court has previously defined the phrase
> 'all commercially reasonable efforts,' it does not follow
> that the phrase itself is ambiguous. The phrase has
> ordinary meaning which is not contradicted by the terms
> of the agreement and which does not result in absurdity.
> It appears that the language used is capable of only one
> reasonable construction, that Lowe's [the purchaser] was
> required to make every effort to obtain the required
> zoning that a reasonable business entity would have made

---

[16]   Although not precedential, a federal court can consider unpublished California cases. *See Employers Ins. of Wausau v. Granite State Ins. Co.*, 330 F.3d 1214, 1220 n.8 (9th Cir. 2003).

under similar circumstances.[17]

*Id.* at *3.

A Minnesota district court, *LeMond Cycling, Inc. v. PTI Holding, Inc.*, No. Civ. 03-5441 PAM/RLE, 2005 WL 102969, at *1 (D. Minn. Jan. 14, 2005), analyzed the term "commercially reasonable efforts" in a licensing agreement.  The court rejected the view that only "industry standards" are relevant to the commercial reasonableness determination. *Id* at *5.  The court reasoned that "[n]o business would agree to perform to its detriment, and therefore whether or not [defendant] performed with commercial reasonableness also depends on the financial resources, business expertise, and practices of [defendant]." *Id.* at *5.

Cott cites a New York district court, *Bear Stearns Funding, Inc. v. Interface Group-Nevada, Inc*., No. 03 Civ. 8259(CSH), 2007 WL 1988150, at *3 (S.D.N.Y. July 10, 2007), where the court discussed a contract term in a loan agreement which required Bear Stearns "to use commercially reasonable efforts to achieve a Securitization which results in the lowest Spread possible."  The court did not, however, provide much analysis on the meaning of the term.  The court suggested that the term did not preclude Bear Stearns from using its "business discretion." *Id*. at *22.  The court also stated that "[a] violation of the good faith duty to obtain a fair market price-or to use commercially reasonable efforts to

---

[17] The word "every" in the court's conclusion that Lowe's was required to make "every effort to obtain the required zoning that a reasonable business entity would have made under similar circumstances" appears tethered to the word "all" in the contractual phrase "all commercially reasonable efforts."

obtain the best price-cannot be established simply by observing, in hindsight, that Bear Stearns could have done something differently that would have produced a better result." *Id*.  Cott's cites this language in its briefing.

There is no settled or universally accepted definition of the term "commercially reasonable efforts."  These cases are consistent with the principle that "commercially reasonable efforts" permits the performing party to consider its economic business interests.

When considering all circumstances bearing on performance, including Cott's business interests, summary judgment is not warranted in Cott's favor.   Whether Cott exerted commercially reasonable efforts is a factually intense issue.   *See Gifford*, 54 Cal. App. 4th at 1006; *Sempra Energy Resources*, 2005 WL 1459950 at *9; *see also Smith v. Selma Community Hosp.*, 164 App. 4th 1478, 1509 (2008) ("[T]he question of reasonableness is ordinarily one of fact.").  Viewing the evidence in a light most favorable Citri-Lite, with respect to Sam's Club and Food Lion, there is a triable issue as to whether Citri-Lite performed commercially reasonable efforts under the circumstances.

### 1.   Sam's Club

Viewing the evidence in a light most favorable to Citri-Lite, with respect to Sam's Club, Cott reduced (Doc. 42 at 16) and then cancelled Slim-Lite demos on March 24, 2005 (Doc. 40 at 24), which the evidence suggests is an important means of promoting a product at Sam's Club (Dragovich Dep. 44:22-24; 74:8-9; 117:16-19.)[18]

---

[18] **See also part IV.B.2 (discussing the importance of demos).**

Having, over the course of a year, substantially increased the distribution of Slim-Lite from its 248-club store location level to a couple hundred additional clubs, Cott's reduction/cancellation of demos came at a time when Slim-Lite was sold in a large number of club stores and was relatively new to some club stores. (Doc. 38, Ex. 39; Nichol Dep. 73:8-23; Doc. 40 at 45-46.)  Slim-Lite was sold in bulk, i.e., in a 12-pack and not individually (Doc. 38, Ex. 57), and the evidence suggests that demos are an important means of fostering sales to new customers because demos allow customers to taste the product before they commit to purchase an entire case (Fields Dep. 117:3-19; Dragovich Dep. 148:16-149:2).

In addition to reducing and then cancelling Slim-Lite demos, Cott failed to follow through on another promotional effort – a packaging change for Slim-Lite.  Cott itself recognized the importance of implementing the packaging change as part of its major marketing initiative to solidify long-term distribution in Sam's Club (Doc. 38, Ex. 32), and Sam's Club suggested that it be done, believing it would increase the product's marketability (Dragovich Dep. 76:4-9; 79:19-22).[19] Despite recognizing the importance of implementing the packaging change and Sam's Club's suggestion that it be done, Cott did not implement the packaging change.  Even after the cut in distribution, when Fields informed Scheiderer that the club count would not be re-established until the packaging change was made and the newly configured product proved itself in existing clubs, (Schiederer Dep. 322:16-20), Cott did not make the change.

---

[19] See also part IV.B.2 (discussing the importance of the packaging change).

1    Apart from the demos Cott reduced and then cancelled, and apart
2  from the packaging change Cott never implemented, Cott has pointed
3  to one other effort it made to promote and sell Slim-Lite at Sam's
4  Club, i.e., lowering the price at which it sold Slim-Lite to Sam's
5  Club in order to get Slim-Lite into more clubs.  This was done in
6  the July 2004 - November 2004 time frame. (Doc. 45, Exs. 8, 39)[20]
7  In a footnote, however, Cott concedes that this price change was
8  never passed on to consumers in the form of lower retail prices at
9  the register. (Doc. 36 at 6 n.3.)  In addition, even if reducing the
10 price at which Cott sold Slim-Lite to Sam's Club led to an increase
11 in the number of clubs carrying Slim-Lite, Cott's efforts to promote
12 and sell Slim-Lite thereafter are at issue in this case.  For
13 example, after the number of clubs carrying Slim-Lite significantly
14 increased, an important time for promotional efforts and to attend
15 to Sam's Club's suggestions, Cott reduced and then cancelled its
16 demos and failed to implement the packaging change.  No party
17 suggests that simply getting Slim-Lite into more clubs was
18 sufficient to satisfy Cott's obligation to use commercially
19 reasonable efforts to promote and sell Slim-Lite.

20    By May 23, 2005, after the number of clubs carrying Slim-Lite
21 fell from 463 stores to 89, Cott was considering an "exit strategy"
22 for Slim-Lite. (Doc. 45, Ex. 143; Doc. 42 at 29).  By October 2005,

23

24    [20] Apparently, Sam's Club agreed to increase distribution if
25 Cott could lower the price to Sam's Club.  Accordingly, Nichol
   asked Horrigan if Cott could use the $.80 marketing allowance in
26 the Agreement against the cost in Sam's Club only, which would move
27 the price from $6.86 to $5.88.  Horrigan responded "[g]o ahead."
   (Doc. 45, Ex. 8.)

28

Cott notified Citri-Lite that it was exercising its right to terminate the Agreement, effective December 31, 2005. (Doc. 40 at 52-53.)  Before the Agreement ended, Cott was only able to get the distribution of Slim-Lite up, at one point in late 2005, to around 116 clubs, well short of the original 248-club level (Doc. 40 at 13, 52.)

Cott's reduction and cessation of demos, and its failure to implement the Slim-Lite packaging change, are sufficient to create a triable issue as to whether Cott breached its obligation to use commercially reasonable efforts to promote and sell Slim-Lite as required by the Agreement.  Although Cott rationally defends its demo decisions at Sam's Club and its failure to implement the packaging change, when the evidence is viewed in a light most favorable to Citri-Lite, it cannot be concluded, as a matter of law, that Cott did not breach its contractual obligation to use commercially reasonable efforts.

    2.   <u>Food Lion</u>

Similarly, with respect to Food Lion, when viewing the evidence in a light most favorable to Citri-Lite, there is a triable issue at to whether Cott breached its obligation to use commercially reasonable efforts to promote and sell Slim-Lite.  There is evidence that Cott did not allocate funding for marketing efforts at Food Lion, as it focused its efforts on Sam's Club and Walmart, (Thompson Dep. 93:20-94:7; Doc. 38, Ex. 32).  According to Horrigan, he did not agree to this approach. (Horrigan Decl. ¶ 29.)   There is also evidence that Cott did not develop any particular marketing plan for Food Lion. (Doc. 42 at 28.)  After Cott ran the summer promo in

2004, McGlothin urged Thompson to run more demos, but Thompson responded that he was not authorized to approve the funding. (McGlothin Dep. 35:19-36:16; Doc. 42 at 29.)

Viewing the evidence in a light most favorable to Citri-Lite, Cott's non-allocation of funding for marketing efforts at Food Lion, its focus on other retailers besides Food Lion, its lack of any particular marketing plan for Food Lion, and its lack of promotions after being prompted to do so by the food broker, suggest that Cott did not use commercially reasonable efforts to promote and sell Slim-Lite at Food Lion.  Cott suggests that it was excused from spending money on and/or engaging in marketing efforts with respect to Food Lion, but the evidence, when viewed in a light most favorable to Citri-Lite, does not resolve this issue.  Although Cott rationally defends its actions with respect to Food Lion, when the evidence is viewed in a light most favorable to Citri-Lite, it cannot be concluded, as a matter of law, that Cott did not breach its contractual obligation to use commercially reasonable efforts.

3.   Conclusion

As Cott argues, as Citri-Lite conceded at oral argument, and as the case law suggests, Cott's economic business interests represent a factor that can be considered when determining whether Cott engaged in commercially reasonable efforts to promote and sell Slim-Lite as required by the Agreement.   Even when considering Cott's business interests among the totality of the circumstances, however, for the reasons stated, summary judgment is DENIED on the ground that Cott did not breach its obligation to use commercially reasonable efforts to promote and sell Slim-Lite.  Whether Cott used

commercially reasonable efforts remains a triable issue.[21]

B.   **Causation**[22]

Causation between breach and damage is an essential element of a claim for breach of contract and breach of the implied covenant of good faith and fair dealing. *Thompson Pacific Construction, Inc. v. City of Sunnyvale*, 155 Cal. App. 4th 525, 541 (2007); *Vu v. Cal. Commerce Club, Inc.*, 58 Cal. App. 4th 229, 234 (1997). "A fundamental rule of law is that whether the action be in tort or contract compensatory damages cannot be recovered unless there is a causal connection between the act or omission complained of and the injury sustained." *McDonald v. John P. Scripps Newspaper*, 210 Cal. App. 3d 100, 104 (1989) (internal quotation marks omitted).

The requisite causation, or causal connection, is established

[21] In the briefing, in addition to Sam's Club and Food Lion, Cott discusses its efforts with respect to Walmart in its statement of facts.  In the argument section of its briefing, however, Cott does not address the commercial reasonableness issue as to Walmart. In its opposition briefing, Citri-Lite does not address Walmart, and Citri-Lite's expert did not prepare any damages calculations as to Walmart.  Accordingly, it appears that Cott's efforts as to Walmart are not, or are no longer, at issue in this case.  If Citri-Lite contends otherwise, it should so notify the court at the forthcoming scheduling conference, and supplemental briefing may be requested.  Similarly, Citri-Lite did not advance any argument that the failure to make a powdered version of Slim-Lite constituted a breach of the Agreement, and Cott barely touched upon the issue. From this, it is inferred that Cott's failure to make a powdered version is no longer an issue in this case.  If Citri-Lite contends otherwise, it should so notify the court at the scheduling conference, and supplemental briefing may be requested.

[22] For purposes of its causation arguments, Cott assumes a breach of the Agreement and the implied covenant of good faith and fair dealing.

when the plaintiff demonstrates that the defendant's breach was a "substantial factor" in causing damage. *Haley v. Casa Del Rey Homeowners Ass'n*, 153 Cal. App. 4th 863, 871 (2007); *US Ecology, Inc. v. State*, 129 Cal. App. 4th 887, 909 (2005); *Linden Partners v. Wilshire Linden Associates*, 62 Cal. App. 4th 508, 530 (1998); *Bruckman v. Parliament Escrow Corp.*, 190 Cal. App. 3d 1051, 1063 (1987). As explained in *US Ecology*:

> The test for causation in a breach of contract (or [implied covenant]) action is whether the breach was a substantial factor in causing the damages. Causation of damages in contract cases, as in tort cases, requires that the damages be proximately caused by the defendant's breach, and that their causal occurrence be at least reasonably certain. A proximate cause of loss or damage is something that is a substantial factor in bringing about that loss or damage. The term 'substantial factor' has no precise definition, but it seems to be something which is more than a slight, trivial, negligible, or theoretical factor in producing a particular result.

129 Cal. App. 4th at 909 (internal citations and quotation marks omitted). "Damages which are speculative, remote, imaginary, contingent or merely possible cannot serve as a legal basis for recovery." *McDonald*, 210 Cal. 3d at 104.

Cott's causation arguments focus on the reduction of distribution of Slim-Lite at Sam's Club. To put Cott's causation arguments in context, as of December 2004, 528 Sam's Club stores carried Slim-Lite. (Doc. 40 at 45-46.) As of 2005, Cott reduced its demos to one demo per month per club. (Doc. 42 at 16). Between December 2004 and March 2005, distribution declined to 463 stores. (Doc. 40 at 46.) On March 24, 2005, Cott notified Sam's Club that it was cancelling demos altogether. (Doc. 40 at 24.) Around the beginning of April 2005, Sam's Club cut the number of stores

carrying Slim-Lite from 463 to 89 stores. (*Id.* at 46.)

### 1. Carson's Expert Report

Cott attacks Citri-Lite's expert John Carson's causation theory. Citing page 15 of Carson's expert report, Cott argues that Carson engaged in "speculation" that "the cancellation of demos" at Sam's Club "could have caused Dragovich [/Sam's Club] to reduce distribution at Sam's" to 89 clubs.   (Doc. 36 at 21.)   Cott oversimplifies Carson's report.   Page 15 of Carson's report states:

> It should be noted that Cott's marketing manager for Slim-Lite testified that the packaging changes would demonstrate to the Sam's Club buyer Cott's 'continued dedication to the brand and efforts to do whatever we could to help them sell.' (Calise depo 345:2-346:12.) As noted above, the decision by the Sam's Club buyer to reduce the number of clubs from 464 to 90 [actually 89][23] was apparently made in late March 2005. This decision was made within days after receiving an email from Cott to terminate all of the remaining demos for 2005. It is also likely that the Sam's Club buyer was also influenced by Cott's failure to make packaging changes to Slim-Lite which had been discussed for nearly a year.
>
> Thus, the failure of Cott to make changes in the packaging and configuration of Slim-Lite was a substantial factor in Cott's inability to maintain sustained sales of Slim-Lite at Sam's Club.
> . . . .
>
> As discussed above, sales of Slim-Lite rapidly declined as the demos were reduced. Substantial sales were also lost when the number of Sam's Clubs was reduced in April 2005 from approximately 500 to about 90 [actually 89]. It appears that the reduction was implemented by the Sam's Club buyer [Dragovich] shortly after Cott requested that all remaining demos be terminated for 2005, and after Cott failed to implement packaging changes he had requested.  He testified that if an item was not meeting its sales objectives, he would recommend that the supplier do demos. (Dragovich depo 44:9-24).

---

[23] Carsons' figures appear to be slightly off, but any minor deviation is immaterial for purposes of a causation analysis.

> In the fall of 2004, Cott estimated the sale of 1,903 million cases of Slim-Lite from Sam's Club for 2005. (Woods Depo, 205:5-206:8; Exhibit 22) In fact, the loss of sales in comparison with their forecast was more than substantial. The retail value of this number of cases, at Sam's Club price of $6.86 per case, is $13,053,000, which, for a total of 500 clubs, would be weekly sales per club of just over $500. There is nothing in the record which indicates why this estimate was not reasonable or why this estimate would not have been realized had Cott[] provided the appropriate marketing efforts to the Slim-Lite brand at Sam's Club.

(Doc. 45, Ex. L at 15.) A review of Carson's report, at page 15, reveals that he is not suggesting or speculating that the cancellation of the demos, standing alone, caused Dragovich (or Sam's Club) to reduce the distribution of Slim-Lite to 89 clubs. Rather, to the extent Carson's report is focused on the cut in distribution as a source of damage to Citri-Lite, Carson suggests that Cott's reduction and cancellation of demos *and* Cott's failure to implement the packaging change influenced the cut in distribution.

   2.   <u>Dragovich and Fields</u>

   Perhaps recognizing that it focused too narrowly on the cancellation of demos and the cut in distribution, Cott argues that "Citri-Lite has not shown any link between Cott's conduct and the loss in business at Sam's." (Doc. 36 at 21.) Cott represents that "neither Dragovich nor Fields – the two buyers with virtually unfettered discretion to determine the fate of Slim-Lite at Sam's Club – identified [in their deposition] any acts by Cott that led them to cut distribution, or which led them not to increase distribution." (*Id.*) In its moving papers, Cott cites excerpts from Dragovich's and Fields' deposition testimony in support of its

1  argument.

2      Cott's argument, and Citri-Lite's response, raise different
3  theories of causation, both of which involve the cut in distribution
4  from 463 to 89 stores.  Under the first theory, the cause of the cut
5  in distribution is the main issue.  Under the second theory, the
6  cause of Cott's failure, after the cut in distribution, to raise the
7  level of distribution (i.e., increase the number of clubs carrying
8  Slim-Lite) is the focal point.

9      Under the first theory, Cott's breach caused the cut in
10 distribution which damaged Citri-Lite.  Under this theory, Cott's
11 reduction and cessation of demos, and its failure to implement the
12 packaging change, (i.e., the breach), purportedly caused Sam's Club
13 to cut the distribution of Slim-lite.  The record evidence in
14 support of this theory is thin, but enough to survive summary
15 judgment.

16     The cut in distribution occurred around the time that the Slim-
17 Lite buyer at Sam's Club changed from Dragovich to Fields.  Neither
18 Dragovich nor Fields recalled what prompted the cut in distribution.
19 (Dragovich Dep. 89:19-25; Fields Dep. 122:12-23.)  Dragovich
20 recalled only generally discussing the possibility of cutting the
21 number of Clubs that were selling Slim-Lite. (Dragovich Dep. 91:12-
22 22.)

23     As to whether the reduction and cancellation of demos played
24 a role in the distribution cut, Dragovich testified that demos drive
25 sales (Dragovich Dep. 44:22-24) and Dragovich views a supplier's
26 willingness to demo as an indication of its commitment to the
27 product (Dragovich Dep. at 121:10-13).  Dragovich recalled a

28
                                34

discussion about Cott's "backing off" of their commitment to demo and Slim-Lite's overall performance at Sam's Club. (Dragovich Dep. 160:17-19.)  Dragovich acknowledged that Slim-Lite did not perform as well at clubs at which it was relatively new as opposed to the clubs in which it had longer exposure. (Dragovich 72:25-73:5.) Although Dragovich recalled Cott's backing off of their commitment to demo (even at clubs at which the product was relatively new), and although Dragovich stated that demos drive sales and indicate a supplier's commitment to the product, Dragovich did not believe (at his deposition) that Cott's cessation of demos and the cut in distribution were related. (Dragovich Dep. 162:8-15; 167:17-21.) Dragovich, however, acknowledged that he did not recall the cut in distribution (Dragovich Dep. 89:19-25), and, naturally, did not testify as to what caused the cut in distribution.  Dragovich discussed a few things which could account for a significant change in the distribution of a product.

> Q.   If Sam's Club were to make a decision to cut hundreds of stores at a time, what would the drivers be to make that dramatic of a decision?
>
> A.   The only one that comes to mind is production ability and capacity. I mean, I don't recall any circumstances where we would cut that many Clubs at one time.
>
> Q.   You mentioned the only thing you could think of is production ability and capacity.  Can you expand on that and explain what you mean by 'production ability.'
>
> A.   Or switching to a new package or cancelling an item because it's not available or we're transitioning to a new package where there is another item number built and another, you know, 200 stores added, 200 Clubs added, 200 Clubs added over here.
>
> Q. Is that what you mean when you refer to production ability and capacity?

**A. Yes, that would be the only thing that would trigger why that dramatic of a change would have occurred.**

(Dragovich Dep. 90:18-91:11).  Although a cancellation of demos is not one of the factors which Dragovich associated with cutting hundreds of stores at a time, he admitted that he could not "recall any circumstances where we would cut that many Clubs at one time." (Dragovich Dep. 90:22-24.)

For her part, Fields testified that she (and Sam's Club) prefer when suppliers conduct demos. (Fields Dep. 117:3-14.) Fields, however, was not concerned that Cott was not conducting demos of Slim-Lite. (Doc. 40 at 50.)  It appears from Fields' testimony, and Citri-Lite concedes, that Cott did not do anything to adversely affect Fields' decisions regarding Slim-Lite, and that Cott met her expectations as a buyer regarding Slim-Lite. (Doc. 40 at 50.)

As to whether Cott's failure to implement the packaging change played a role in the cut in distribution, Dragovich testified regarding the importance of changing Slim-Lite's packaging. Dragovich acknowledged that he felt a packaging change from a 12-pack with 20 ounce bottles to a 24-pack with 16.9 ounce bottles would improve Slim-Lite's marketability at Sam's Club. (Dragovich Dep. 141:10-142:8.)  Dragovich also acknowledged that the idea for the packaging change originated from Sam's Club and that a 16.9 ounce bottle was a "focus" for Sam's Club as they were "trying to line up 16.9 ounce [bottles] [for] all our beverages." (Dragovich Dep. 76:4-8; 79:19-22.)  Dragovich also noted that "tuxedo wrap, the four-color, high graphic wrap was something we were asking our suppliers to look at as well because it promoted their product much

36

better and where we made those changes, we saw increases in sales."
(Dragovich Dep. 76:9-13.)  Dragovich also testified that he compared
the performance of Slim-Lite with the performance of another drink
that Sam's Club carried, Diet Ice, and Diet Ice was outselling Slim-
Lite on an average-per club basis.   (Dragovich Dep. 73:16.)
Dragovich acknowledged that he may have recommended a packaging
change for Slim-Lite as something Cott could do to improve the sales
performance of Slim-Lite. (Dragovich Dep. 74:3-8.)

While Dragovich recognized the value of changing Slim-Lite's
packaging, he did not specifically state, one way or the other,
whether a failure to make a packaging change could account for a
drastic cut in distribution like the one Slim-Lite experienced.  He
did acknowledge that "transitioning" or "switching to a new package"
could explain a drastic cut in the distribution of a particular
product, as the newly configured product would get a new item number
and, presumably, be ordered separately while the old configuration
is phased out of distribution. (Dragovich Dep. 91:2-7.)  Fields'
deposition testimony, in the record, does not address the packaging
change or Cott's failure to implement it.

The circumstantial evidence suggesting that it was Cott's
reduction and cancellation of the demos, and its failure to
implement the packaging change, that caused the cut in distribution
is inconclusive.  It is, however, sufficient to create a triable
issue of fact as to causation.

Interpreting the evidence in a light most favorable to Citri-
Lite and drawing all reasonable inferences in favor of Citri-Lite,
the evidence suggests that demos drive sales, they are preferred by

37

Sam's Club, and they demonstrate a supplier's commitment to its product.  The evidence further suggests that another beverage, Diet Ice, was outperforming Slim-Lite on an average per-club basis and that Dragovich/Sam's Club recommended a packaging change for Slim-Lite believing it would increase the product's marketability.  One reasonable inference from the evidence is that Cott's decision to cancel demos altogether signaled a potential instability or reduction in future sales (especially at clubs at which Slim-Lite was relatively new) and also demonstrated a lack of commitment to the product, an inference all the more plausible given that Cott had not implemented a packaging change that Sam's Club recommended as a tool for increasing the product's marketability.  Added to the extremely close timing between Cott's cancellation of demos and the reduction in the number of clubs carrying Slim-Lite, Citri-Lite has enough evidence to create a triable issue of fact as to causation. Cott does not identify any non-breach reason for the cut in distribution that would otherwise dispel a negative inference arising from the suspicious timing.[24]  Again, neither Dragovich nor

---

[24] Cott's inability to articulate a non-breach reason (or any reason) for the cut in distribution is comparable to an employer who cannot identify a non-retaliatory reason for an adverse employment action in an employment retaliation case.  In employment retaliation cases, timing evidence (i.e., a close temporal connection between an employee's engagement in protected activity and the employer's adverse employment action) can supply sufficient evidence of causation to create a prima facie case. *Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1065 (9th Cir. 2002) ("[C]ausation can be inferred from timing alone where an adverse employment action follows on the heels of protected activity."); *see also Davis v. Team Elec. Co.*, 520 F.3d 1080, 1094 (9th Cir. 2008).  At the summary judgment stage, the failure of an employer

Fields could recall the cut in distribution, and, naturally, neither testified as to its cause.  Although, in hindsight, Dragovich did not believe that Cott's cessation of demos and the cut in distribution were related, viewing the evidence in the light most favorable to Citri-Lite, Dragovich's inability to recall the cut in distribution at all (and, by extension, what prompted it) reduces the effect of his testimony as to the relationship between Cott's cessation of demos and cut in distribution.  Dragovich did not testify that Cott's reduction and cessation of demos combined with Cott's failure to implement the packaging change were unrelated to the cut in distribution.

At summary judgment, Citri-Lite does not have to prove causation by a preponderance of the evidence; rather, the evidence need only create a genuine issue of fact.  Based on the evidence, there is a triable issue of fact as to whether Cott's reduction and cancellation of demos, along with its failure to implement the

---

to identify a non-retaliatory reason for the adverse employment action would not overcome the inference of causation created by the timing evidence, and the employee would survive summary judgment. *See, e.g., Davis*, 520 F.3d at 1094; *see also Mesnick v. General Elec. Co.*, 950 F.2d 816, 824 (1st Cir. 1991) ("If the plaintiff has made out his prima facie case, and the employer has not offered a legitimate, nondiscriminatory reason to justify the adverse employment action, then the inference of discrimination created by the prima case persists, and the employer's attempt to secure summary judgment should be rebuffed.").  Here, Cott's inability to identify a non-breach reason (or any reason) for the cut in distribution leaves intact the negative inference created by the suspicious timing.  Moreover, Citri-Lite has more than just mere timing evidence to create an inference of causation between Cott's purported breach (i.e., the reduction and cancellation of demos, and the failure to implement the packaging change) and the cut in distribution.

packaging change,  caused the cut in distribution.

Under the second theory, *after* the cut in distribution, Cott's breach caused the distribution of Slim-Lite to remain at low levels. Under this theory, Cott's cessation of demos, and its failure to implement the packaging change, (i.e., the breach), negatively affected the sales of Slim-Lite and kept the distribution of Slim-Lite at lower levels resulting in damage to Citri-Lite.   The evidence supporting this theory is enough to survive summary judgment.

After Sam's Club cut the number of stores carrying Slim-Lite, Cott informed Citri-Lite that it would endeavor to increase the number of stores carrying Slim-Lite back to previous levels. (Horrigan Decl. ¶ 39; Doc. 40 at 51.) Cott did not meet this objective.   Cott ceased conducting demos of Slim-Lite and did not reintroduce demos after the cut in distribution. Demos drive sales, they are preferred by Sam's Club, and they demonstrate a supplier's commitment to its product.   Cott, however, did not utilize demos even after the distribution was drastically cut.   Dragovich testified that in making decisions to increase distribution, he considers the current performance of the product in existing clubs. (Dragovich Dep. 61:22.)  Based on Dragovich's testimony, one way to improve performance is to conduct demos. (Dragovich Dep. 44:22-24; 73:22-74:9.)  Demos increase sales:

> Q. Would I be correct in assuming that although the supplier paid money to demo, that Sam's Club saw the benefit of demo'ing, not in getting money from the suppliers, but in increasing the sales as a result of the demos.
>
> A. Yes.

**(Dragovich Dep. 119:18-23.)**

**As to the packaging, again Dragovich acknowledged that the idea for the packaging change originated from Sam's Club and that a 16.9 ounce bottle was a "focus" for Sam's Club.  Changing the packaging was viewed by Dragovich/Sam's Club as a way to increase the product's marketability.   According to Scheiderer, after the cut in distribution, Fields informed Scheiderer that the club count would not be re-established until the packaging change was made and the newly configured product proved itself in existing clubs. (Schiederer Dep. 322:16-20.)  Cott, however, did not implement the packaging change.**

**Viewing the evidence in a light most favorable to Citri-Lite, and drawing all reasonable inferences in its favor, the performance of a product is something which Dragovich/Sam's Club considers when deciding whether to increase a product's distribution, and, according to Dragovich, demos drive sales and increase performance. A reasonable inference from this evidence is that conducting demos is way to lay the foundation for a sales increase and an increase in distribution.  Cott did not pursue this promotional alternative. The evidence also suggests that Sam's Club recommended a packaging change for Slim-Lite and implementing it was important to re-establishing club count.   Cott, however, did not implement the packaging change and the distribution of the product remained at low levels.   The circumstantial evidence is sufficient to create a triable issue of fact as to whether Cott's cessation of demos along with its failure to implement the packaging change caused distribution of Slim-Lite to remain at depressed levels after the**

1  cut in distribution resulting in damage to Citri-Lite.

2  Cott's motion for summary adjudication on the issue of
3  causation is DENIED.

4  C.  Damages

5  1.  The Termination Period As A Limit On Damages

6  Citing *Martin v. U-Haul Co. of Fresno*, 204 Cal. App. 3d 396
7  (1988), Cott argues that the termination clause in the Agreement,
8  which permits Cott to terminate the agreement upon sixty (60) days
9  advance notice, imposes a substantive limitation on the scope of
10  Citri-Lite's recoverable damages.  Cott is correct.

11  In *Martin*, the plaintiff entered into a dealership agreement
12  with defendant, U-Haul Company of Fresno ("U-Haul Company"),
13  pursuant to which the plaintiff rented out U-Haul Company vehicles
14  and other equipment to customers, gave the gross receipts to U-Haul
15  Company, and then received commissions in return. *Id.* at 400.  The
16  dealership agreement permitted termination by either party without
17  cause on "thirty days written notice" or termination "without
18  previous written notice upon violation by the opposite party of any
19  promise or condition" mentioned in the agreement. *Id.* at 405. The
20  U-Haul Company terminated the agreement without any previous written
21  notice to plaintiff.  *Id.* at 402-03, 405, 410. On the day of
22  termination, the U-Haul Company arrived at the plaintiff's business
23  premises and took back the U-Haul vehicles and equipment. *Id*. at
24  402-04.

25  The jury found that the U-Haul Company had terminated the
26  dealer agreement without good cause, i.e., that the U-Haul Company
27  violated the termination provision.  The jury entered a verdict for

28

plaintiff and awarded $29,000 in compensatory damages. *Id.* at 400, 407.  The trial judge granted defendant a new trial unless plaintiff consented to a reduction of damages to $725, which represented the amount of money plaintiff would have earned in an additional thirty days of U-Haul dealership business. *Id.* at 400, 410-11.   This reduction assumed that, at the time of the breach, had plaintiff received prior written notice of termination as provided for in the agreement, plaintiff could expect to stay in business, and receive monetary benefits from the agreement, only for another thirty days. *Id.* at 410-411. The appellate court affirmed.

After reviewing older cases such as *Jewell v. Colonial Theater Co.*, 12 Cal. App. 681 (1910), *Cline v. Smith*, 96 Cal. App. 697 (1929), and *Pecarovich v. Becker*, 113 Cal. App. 2d 309 (1952), the appellate court concluded that, in light of the provision permitting termination of the dealership agreement without cause upon thirty-days advance written notice, plaintiff could not reasonably expect, and was not entitled to receive, compensatory damages for a period exceeding thirty days.  The court reasoned:

> The specific rule that a termination clause limits recoverable damages to the notice period is consistent with the general requirement that contract damages are limited to those foreseeable by the parties at the time of contracting. Parties who agree that a contract may be terminated for any reason, or no reason, upon the giving of the specified notice could not reasonably anticipate that damages could exceed that notice period.
>
> . . . .
>
> Civil Code section 3358 provides in pertinent part, 'no person can recover a greater amount in damages for the breach of an obligation, than he could have gained by the full performance thereof on both sides.'  Thus, courts will not, except where exemplary damages are awarded, permit a party to a contract to recover more on the

43

breach thereof than he would have received by due
performance of the agreement. If U-Haul had followed the
notice requirements in its dealership contract, it could
have terminated Martin's dealership after providing a
30-day notice. Full performance by U-Haul would only have
resulted in an additional 30 days of U-Haul dealership
business for Martin. That 30-day period is all that
Martin could reasonably be assured of remaining in
business.

Because of the 30-day notice provision neither party to
the dealership contract could reasonably anticipate that
damages resulting from a breach of that contract would
exceed those potentially accruing during a 30-day period
after the breach. Furthermore, awarding the wronged party
damages which exceed those attributable to the 30 days
immediately following the breach would place that party
in a better position than that resulting if the breaching
party had performed in accordance with the terms of the
agreement. Therefore, the trial court was correct when it
granted the new trial motion conditioned upon Martin's
consent to a reduction in the damage award from $29,000
to $725.

*Martin*, 204 Cal. App. 3d at 409-11.

The *Martin* court's analysis of the termination clause, and its

impact on recoverable damages, must be understood in light of the

circumstances of the case.   Upon termination of the dealership

agreement, the U-Haul Company had the power to and did take back its

vehicles and equipment.   Had the U-Haul Company properly terminated

the contract upon thirty days advance written notice, the plaintiff

could reasonably expect to conduct U-Haul business for the next

thirty days before the U-Haul Company took back its vehicles and

equipment.   Beyond that point, however, with no U-Haul vehicles or

equipment left on his lot, the plaintiff could not expect any

further economic benefit from the dealer agreement.   Accordingly,

"[f]ull performance by U-Haul would only have resulted in an

additional 30 days of U-Haul dealership business for" plaintiff and

nothing more.   *Id*. at 410.   At the same time, awarding him

44

compensatory damages in excess of those attributable to the 30 days immediately following the breach would have placed him in a better position than if the U-Haul Company had performed in accordance with the terms of the agreement. *Id.* at 410-11.

*Martin's* reasoning applies here and limits Citri-Lite's recoverable damages. Cott properly terminated the Agreement without cause by providing Citri-Lite, in October 2005, a sixty-day advance written notice that it was terminating the Agreement.(Doc. 40 at 52-23, 64).[25] After that sixty-day notice period elapsed, the Agreement terminated and Citri-Lite could not reasonably expect further performance or royalty payments from the Agreement beyond that point. At least one, if not more, of Citri-Lite's damages theories, however, projects Cott's sales of Slim-Lite and royalty payments to Citri-Lite through *2015*. These damages theories presuppose more than full performance by Cott as limited by the contract's express terms. To the extent Citri-Lite seeks damages for lost royalty payments beyond the termination of the Agreement, Plaintiff is barred from recovering those damages. At oral argument on the motion, Citri-Lite conceded the point, agreeing that *Martin* precludes recovery of lost royalties beyond the term of the Agreement.

Recognizing *Martin's* impact, Citri-Lite argues that is not "simply seeking lost royalties." (Doc. 41 at 9.) Rather, Citri-Lite is seeking "lost royalties during the Agreement <u>and</u> forseeable and permanent damage to its goodwill." (*Id.*) *Martin* did not explicitly

---

[25] Citri-Lite does not assert that Cott acted improperly in terminating the Agreement.

deal with the loss of goodwill.  Citri-Lite is correct to the extent it suggests that *Martin* does not preclude recovery for loss of goodwill.

In *Martin*, the plaintiff did not retain the U-Haul vehicles or equipment upon the termination of the dealership agreement, 204 Cal. App. 3d at 402-03, and, accordingly, the plaintiff did not expect any future stream of U-Haul business after the cessation of the agreement.  Here, however, the plaintiff, Citri-Lite, got something back at the end of the agreement: the product and the brand it created, Slim-Lite.   At the end of the Agreement, Citri-Lite continued to sell Slim-Lite. (Doc. 40 at 55.)  Accordingly, to the extent Cott's alleged breaches during the Agreement harmed Slim-Lite's reputation and goodwill in the marketplace, Citri-Lite, as the original product owner, can seek to recover for a loss of goodwill.  *Martin* does not suggest otherwise.   The reasoning of *Martin* does, however, preclude Citri-Lite from projecting what its goodwill would have been in the future on the assumption that Cott continues to promote and sell Slim-Lite *beyond* the term of the Agreement.  Had Cott fully performed, Citri-Lite would have obtained Cott's promotional and selling efforts through the remainder of, and not beyond, the sixty-day termination period.  Citri-Lite's goodwill damages, if any, cannot assume any performance by Cott beyond the termination of the Agreement and any corresponding impact on goodwill.  To the extent the goodwill damages Citri-Lite seeks are premised on Cott's performance beyond the termination of Agreement, Citri-Lite is barred from recovering those damages.   Summary adjudication on the limitations on recovery of lost royalty payments

1   and goodwill damages is GRANTED.

2       Cott also argues in reply that, with respect to goodwill

3   damages, Neches' report is flawed because it does not contain any

4   goodwill valuation, only a lost profits calculation, and Neches

5   cannot now prepare a goodwill valuation that he omitted from his

6   report.  According to Cott, Neches' damages calculation "is not a

7   goodwill valuation at all" because a goodwill valuation includes a

8   computation of "the current value of future loss profits *minus* the

9   value of the plaintiff's net assets," and Neches failed to determine

10  the latter.    In his declaration Mr. Neches claims to have

11  incorporated some goodwill component in his future lost profits

12  analysis. (Neches Decl. ¶¶ 5, 13.)  Even assuming Cott is correct

13  and that Neches' report does not contain goodwill calculations, Cott

14  has not filed a separate motion attacking Neches' expert report for

15  this deficiency and Cott's argument is better raised in the context

16  of a motion in limine, such as a motion under Rule 37. *See generally*

17  *Yeti by Molly, Ltd. v. Deckers Outdoor Corp.,* 259 F.3d 1101, 1105-06

18  (9th Cir. 2001); *Tracinda Corp. v. DaimlerChrysler AG*, 362 F. Supp.

19  2d 487, 505-11 (D. Del. 2005).  The thrust of Cott's argument is not

20  that Citri-Lite lacks any evidence from which to prepare a viable

21  goodwill valuation but rather that Neches' damages calculation "is

22  not a goodwill valuation at all," and, citing *Yeti by Molly*, Cott

23  argues that "Neches [cannot] prepare a goodwill calculation now" at

24  this stage in the litigation. (Doc. 51 at 9.)

25      To the extent Citri-Lite seeks damages for lost royalty

26  payments beyond the termination of the Agreement, Citri-Lite is

27  barred from recovering such damages.  To the extent Citri-Lite seeks

28

**47**

goodwill damages which are premised on performance by Cott beyond the termination of Agreement, Citri-Lite is barred from recovering those damages.  Cott's challenge to Neches's report does not provide a separate basis upon which to grant summary judgment in favor of Cott and can be raised, if necessary, in an appropriate motion.

### 2.   Speculative Damage Theories

Cott argues that, aside from the damages limitation imposed by the 60-day termination period, two of Citri-Lite's proposed 10-year profit or royalty projections are improperly speculative.  Under Citri-Lite's first damages scenario, Citri-Lite (or its expert, Neches) assumes that Cott would have renewed the Agreement five times.  Under Citri-Lite's second damages scenario, Citri-Lite assumes that Cott would have exercised the purchase option in 2006.  "Damages which are speculative, remote, imaginary, contingent or merely possible cannot serve as a legal basis for recovery." *McDonald*, 210 Cal. 3d at 104.  "Evidence to establish profits must not be uncertain or speculative." *Continental Car-Na-Var Corp. v. Moseley*, 24 Cal. 2d 104, 113 (1944).

There is no evidence that Cott would have renewed the Agreement once, let alone five times, and there is no evidence that Cott would have exercised the purchase option.  Citri-Lite's damages theories are based on purely "imaginary" and "speculative events."  The speculative nature of these damages theories is, however, a moot issue.  These damages theories are infirm under *Martin* because they presuppose more than full performance by Cott which properly terminated the Agreement in 2005.  By assuming that Cott would renew the Agreement on successive occasions and/or exercise the purchase

option in 2006, Citri-Lite's damages theories provide Citri-Lite with more damages than full performance would have provided — Cott's promotional and selling efforts through the sixty-day termination period and nothing further. Cott's motion for summary judgment/adjudication as to the speculative nature of the first and second damages scenarios is DENIED as moot.

D.   <u>Objections</u>

Cott raises objections to certain of Citri-Lite's statements of disputed facts and certain paragraphs in declarations filed by Citri-Lite in opposition to Cott's motion. (Doc. 52.) To the extent Cott's motion for summary judgment/adjudication is denied, no reliance has been placed on any statements in Citri-Lite's disputed facts or in Citri-Lite's declarations which are subject to a proper objection. Accordingly, Cott's objections are DENIED as moot.

V.   CONCLUSION

For the reasons stated above:

1.   Cott's motion for summary judgment/adjudication on the grounds that Cott did not breach its obligation to use commercially reasonable efforts to promote and sell Slim-Lite is DENIED.

2.   Cott's motion for summary judgment/adjudication as to causation is DENIED.

3.   Cott's motion for summary judgment/adjudication as to Citri-Lite's damages theories is GRANTED in part and DENIED in part:

a.   To the extent Citri-Lite seeks damages for lost royalty payments beyond the termination of the Agreement, Citri-Lite is barred from recovering those damages; GRANTED;

b.   To the extent Citri-Lite seeks goodwill damages which

49

are premised on performance by Cott beyond the termination of Agreement, Citri-Lite is barred from recovering those damages; GRANTED;

       c.  Cott's challenge to Neches's report that it does not contain a goodwill valuation and that Neches cannot now prepare a goodwill valuation, does not provide a separate basis upon which to grant summary judgment in Cott's favor; the issue will be heard in limine;

       d.  Cott's motion for summary judgment/adjudication on the grounds that the first and second damages scenarios are speculative is DENIED as moot.

Consistent with Rule 56(d)(1), both parties shall have five (5) days following service of this decision to file a list of material facts which each party believes are not genuinely at issue for purposes of trial.  If separately filed by the parties, these lists shall not exceed five pages.  To the extent practicable, the parties should meet and confer to determine whether and to what extent any material facts are agreed upon for purposes of trial.  Agreed upon facts should be listed in a joint filing.

The parties are instructed to contact the courtroom deputy clerk to set a mutually convenient further telephonic scheduling conference.


IT IS SO ORDERED.

Dated:   __June 11, 2010__           __/s/ Oliver W. Wanger__
                                       UNITED STATES DISTRICT JUDGE