**UNITED STATES DISTRICT COURT**

**EASTERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| THE CITRILITE COMPANY, Inc.,<br><br>          Plaintiff,<br><br>     v.<br><br>COTT BEVERAGES, Inc.,<br><br>          Defendant. | 1:07-cv-01075-OWW-JLT<br><br>MEMORANDUM DECISION AND ORDER RE: DEFENDANT'S MOTIONS TO STRIKE (Docs. 75, 76) |

## I. INTRODUCTION.

Plaintiff the Citrilite Company, Inc. ("Plaintiff") proceeds with an action for damages against Defendant Cott Beverages, Inc. ("Defendant").

Defendant filed motions to strike certain opinions of Plaintiff's experts on December 6, 2010. (Docs. 75, 76). Plaintiff filed opposition to Defendant's motions on December 27, 2010. (Docs. 78, 80). Defendant filed replies on January 3, 2011. (Docs. 82, 83).

## II. FACTUAL BACKGROUND.[1]

From 1996 to 2003, Plaintiff produced and marketed Slim-Lite, a zero calorie fruit-flavored drink. On December 28, 2003,

---

[1] The following factual background is limited to issues relevant to Defendant's motions to strike. An exhaustive factual history is set forth in the Memorandum Decision re: Defendant's Motion for Summary Judgment. (Doc. 65).

**1**

Plaintiff entered into a written agreement entitled "Intellectual Property License and Purchase Option Agreement" ("the Agreement") with Defendant, a producer and distributer of various non-alcoholic beverages.

Under the terms of the Agreement, Plaintiff granted Defendant the exclusive right to use the Slim-Lite brand identity and all associated intellectual property rights for purposes of the manufacture, production, distribution, sale and marketing of Slim-Lite.  In exchange, Defendant agreed to make royalty payments to Plaintiff based on a rate of fifty cents ($0.50) per case of product sold (i.e., fifty cents per 240 ounces of the product sold by Cott), with a guaranteed minimum royalty of $350,000 per year.

The Agreement required Defendant to spend a certain amount to market Slim-Lite and to "otherwise use commercially reasonable efforts to promote and sell" Slim-Lite "so as to maintain and enhance the value of the goodwill" inhering in Slim-Lite and "produce the maximum amount of" royalty under the Agreement. Plaintiff contends that Defendant breached its obligation to use commercially reasonable efforts to promote and sell Slim-lite. *Inter alia*, Plaintiff contends that Defendant's reduction and eventual elimination of in-store demos of Slim-Lite at Sam's Club was commercially unreasonable and resulted in lost royalties and damage to the value of Slim-Lite's goodwill.

The proper methodology for assessing the impact of Defendant's reduction and elimination of in-store demos at Sam's Club is the subject of a dispute between the parties' experts and is the issue underlying Defendant's first "motion to strike" certain opinions related to the effectiveness of in-store demos.  (Doc. 75).

**2**

Defendant's second motion to strike assails the methodology used by Plaintiff's damages expert to calculate future lost profits and damage to Slim-Lite's goodwill. (Doc. 76).

### III. **LEGAL STANDARD**.

Federal Rule of Civil Procedure 12(f) provides that a court may strike from any pleading "an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." Fed. R. Civ. P. 12(f). For the purposes of a motion to strike, immaterial matter is "that which has no essential or important relationship to the claim for relief or the defenses being pleaded." *Fantasy, Inc. v. Fogerty*, 984 F.2d 1524, 1528 (9th Cir. 1993), rev'd on other grounds, 510 U.S. 517, 114 S. Ct. 1023, 127 L. Ed. 2d 455 (1994). Scandalous matters are allegations that unnecessarily reflect on "the moral character of an individual or states anything in repulsive language that detracts from the dignity of the court." *Consumer Solutions Reo, LLC v. Hillery*, 658 F. Supp. 2d 1002, 1021 (N.D. Cal 2009). Rule 12(f) is deigned to eliminate from consideration issues that "can have no possible bearing on the subject matter of the litigation." *Naton v. Bank of California*, 72 F.R.D. 550, 552 n.4 (N.D. Cal. 1976). In addition to Rule 12, a district court's inherent authority to manage its docket authorizes the court strike matters from the docket.

Defendant's motions are procedurally unorthodox. A Rule 12 motion is necessary directed to a pleading, which is defined by Federal Rule of Civil Procedure 7. The pleadings have long been settled, as the summary judgment phase of this case is complete. It appears that Defendant's motions to strike are motions *in limine*, evidentiary in nature, to exclude certain expert opinions

**3**

from admission at trial. Pursuant to Local Rule 281(b)(5), the proper procedure for advancing motions *in limine* is to identify disputed evidentiary issues in the pre-trial statement, E.D. Cal. R. 281(b)(5)), whereafter a motion *in limine* schedule is set. The pre-trial conference for this matter is set for February 28, 2011. (Scheduling Conference Order, Doc. 71). Motions *in limine* will be scheduled at that time.

## IV. DISCUSSION.

**A.   Opinions Related to the Effectiveness of In-Store Demos**

   **1.   John Carson's Opinions**

John Carson is a designated expert retained by Plaintiff to provide opinions on the commercial reasonableness of Defendant's efforts to promote Slim-Lite. Mr. Carson has over thirty-five years experience in the beverage industry and has served as the president and chief executive officer for companies involved in the sales, marketing, and distribution of a variety of soft drinks and adult beverages. Mr. Carson has been directly involved in selling to major retailers and managing third party distributor relationships.

In his initial rebuttal report ("Rebuttal Report"), Mr. Carson criticizes analysis provided by Defendant's expert, Dr. Randolph E. Bucklin. Dr. Bucklin performed a regression analysis which purports to demonstrate that in-store demos of Slim-Lite at Sam's Club were not profitable because the demos did not generate sufficient sales to cover the costs of the demos. Mr. Carson rejects Dr. Bucklin's "implicit conclusion" that the goal of demos was to immediately generate a sufficient increase in Slim-Lite sales to justify the expense of the demos. (Carson's Initial

**4**

Rebuttal Report, Doc. 76, Ex. C at 7). Mr. Carson opines that the purpose of in-store demos "is not to generate an immediate sales increase but rather to support initial sales levels and to provide enough product trial and awareness to promote long-term sales growth." (Id.). Mr. Carson contends Dr. Bucklin's analytical framework is flawed because it focuses only on the immediate effects of demos on sales in the short run and does not account for the role demos play in promoting long-term sales growth. For example, Mr. Carson argues that Dr. Bucklin's analysis does not take into consideration the impact canceling all demos had on Defendant's relationship with Sam's Club. According to Mr. Carson, because demos demonstrate to a retailer a supplier's level of commitment to promoting a product, a supplier's decision to cancel all remaining demos adversely impacts the supplier's relationship with the retailer, leading to repercussions for overall distribution and volume with the retailer in the long-term. (Carson's Initial Rebuttal Report, Doc. 76, Ex. C at 6, 9).

Mr. Carson's Rebuttal Report offers the following critique of Dr. Bucklin's regression analysis:

> [R]ather than analyzing whether the demos immediately paid for themselves, as I understand Dr. Bucklin to have done, *a better measure of the effectiveness of demos is to analyze the cumulative impact of demos on the cumulative sales of Slim-Lite.* In reviewing the demo program practiced by Citri-Lite prior to December 2003, I see that Citri-Lite utilized demos for this purpose, which is demonstrated by the relatively gradual expansion into 248 Sam's Club stores over a period of several years and a steady increase in sales.

(Id.)(emphasis added). Mr. Carson's Rebuttal Report does not explain what he means when he uses the term "cumulative sales." Based on the criticisms Mr. Carson advances in the Rebuttal Report,

**5**

it appears that when Mr. Carson discusses "the cumulative impact of demos on the cumulative sales," Mr. Carson is referring to *cumulative long-term increase in sales* attributable to in-store demos.

Defendant seeks an order striking the portion of Mr. Carson's opinion italicized above. (Doc. 75 at 2). Defendant contends that (1) use of cumulative demo activity to explain cumulative sales figures is an unorthodox method that is unsupported in the field of marketing research; and (2) Carson's proposed cumulative analysis is unreliable because regression analysis of two sets of cumulative data inherently creates the appearance of a relationship, regardless of whether the data sets are related, as both cumulative data sets necessarily grow over time. Defendant's arguments are misdirected. Defendant's arguments apply to the mathematical methodology underlying Thomas Neches' regression analysis, not to Mr. Carson's criticism of the manner in which Dr. Bucklin evaluated the utility of Sam's Club demos.

Mr. Carson does not purport to know *how* to construct a mathematical model to assess the cumulative impact of demos on cumulative long-term sales increases, he simply opines that such an assessment is favorable to Dr. Bucklin's analysis and purports to identify flaws in Dr. Bucklin's model. Nothing in Mr. Carson's curriculum vitae suggests that Mr. Carson has sufficient education or experience in mathematics to qualify him to fashion a methodology for analyzing and comparing data sets through regression analysis,[2] and it is clear that Mr. Carson's Rebuttal

---

[2] Mr. Carson's curriculum vitae does not indicate what degrees he holds.

**6**

Report does not offer an alternative statistical model to Dr. Bucklin's.  The Rebuttal Report provides: "Thomas Neches is submitting a critique of [Dr. Bucklin's regression analysis], and therefore, I do not comment on the statistical soundness of that analysis." (Rebuttal Report at 6).  Nor does Mr. Carson express the opinion in his Rebuttal Report that total cumulative weekly sales of Slim-Lite should be included as the dependant variable in a least-squares multivariate linear regression analysis; Thomas Neches' concluded this was appropriate in his regression model based on Mr. Carson's opinion regarding the long-term goals of demo programs.  The fact that Mr. Neches devised an allegedly unreliable methodology based on Mr. Carson's opinion does not render *Mr. Carson's* opinion unreliable.

Mr. Carson's experience qualifies him to offer his criticism of Dr. Bucklin's general analytical framework, and Mr. Carson's criticism may assist the fact finder in determining the weight that it should afford Dr. Bucklin's regression analysis.  Defendant's motion to strike Mr. Carson's opinion is DENIED without prejudice to Defendant's right to file a proper motion *in limine.*

**2. Thomas Neches' Regression Analysis**

Thomas Neches is a designated expert retained by Plaintiff to determine Plaintiff's economic damages.  Mr. Neches has thirty years experience performing accounting, financial, economic, and statistical analysis. Mr. Neches is a certified public accountant and is certified in financial forensics, among other disciplines. On October 22, 2010, Mr. Neches prepared an Updated Expert Report ("Updated Report") in which he criticized Dr. Bucklin's statistical analysis of the effectiveness of in-store demos at Sam's Club.

**7**

Among other criticisms levied in the Updated Report, Mr. Neches asserts that Dr. Bucklin's analysis fails to account for the impact of demos on long-term cumulative sales. Mr. Neches conducted a least-squares multivariate linear regression analysis to estimate the cumulative weekly number of Slim-Lite cases sold as a function of three factors: the cumulative number of weekly Friday through Sunday demos; the cumulative number of Monday through Thursday demos; and the number of stores carrying Slim-Lite in the week. Mr. Neches' analysis indicates that Friday through Sunday demos at Sam's Club where cost-effective, but that Monday through Thursday demos were not.

Defendant argues that Mr. Neches' regression analysis is neither relevant nor admissible. In support of its position, Defendant advances three contentions, each of which is essentially a gloss on the central criticism Defendant raises: any two cumulative data sets may appear to demonstrate a relationship and thus regression analysis of such data sets is unreliable. Defendant contends that (1) cumulative analysis of sales data has not gained acceptance in the field of marketing research; (2) statistical analysts warn against using cumulative analysis of data sets; and (3) cumulative analysis can incorrectly imply a relationship between almost any two sets of data.

Defendant's expert, Dr. Bucklin, states "using cumulative demo activity to explain cumulative sales is an unorthodox approach...I have never seen [Mr. Neche's] type of formulation used in the analysis of marketing data." (Bucklin's Second Rebuttal Report, Doc. 76-4, Ex. D at 4). Although Dr. Bucklin has not seen a specific application of a least-squares multivariate linear

**8**

regression analysis in which cumulative sales was used as the dependant variable, Dr. Bucklin does not dispute that regression analysis of cumulative data sets is a generally accepted scientific practice, albeit one that is subject to scrutiny in light of the well-recognized pitfalls of such analysis. The econometrics text Dr. Bucklin cites in his report provides:

> It is important to be aware of trends in analyzing the relationships between two variables that are changing over time. One reason is that is it easy for investigators to be fooled into believing that there is a real relationship between two variables when in fact the two variables are unrelated. For example, if both variables are following an upward trend over time, it will appear that the dependent variable is increasing because the independent variable is increasing.

(Doc. 75, Motion to Strike at 7). Dr. Bucklin's own authority indicates that regression analysis of cumulative data is an accepted methodology, provided the results of such analysis are placed in the context of natural trends inherent in the data sets; at trial, or during a hearing on a motion *in limine*, Defendant can elicit this context during cross-examination of Mr. Neches and direct examination of Dr. Bucklin. Further, the econometrics text cited by Dr. Bucklin, as well as his own statements, reveal that the real danger underlying regression analysis of cumulative data sets – implying a relationship between completely unrelated sets of data– is not present here. Dr. Bucklin cannot argue in good faith that there is no relationship between demos and sales, as even his own analysis demonstrates the existence of a relationship:

> [T]he approach I have taken regressing current sales on current and lagged demos is the appropriate way to estimate the effect of demos on Slim-Lite sales. Note that I find the effect to be positive and significant when using my approach.

**9**

(Bucklin's Second Rebuttal Report, Doc. 76-4, Ex. D at 5). Because, as even Dr. Bucklin concludes, there is *some* relationship between cumulative demos and sales, it is axiomatic that cumulative demos are related to cumulative sales. Whether or not Mr. Neches' analysis overstates the relationship between cumulative demos and cumulative sales relates to the credibility and weight of Mr. Neches' analysis, not its admissibility. To the extent testimony reveals that Mr. Neches' regression model is designed to magnify the relationship between cumulative demos and cumulative sales by building in a positive correlation arising out of the inherent upward trend attendant to cumulative data sets, the fact finder can draw appropriate inferences regarding Mr. Neches' credibility and the value of his analysis.[3]

Dr. Bucklin's attempt to demonstrate the fallacy of Mr. Neches' methodology by conducting a regression analysis of cumulative data concerning rainfall figures in Seattle, Washington and the Los Angeles Lakers' basketball scores during the 2008-2009 season is unavailing. Unlike the cumulative data sets included in Mr. Neches' analysis, Lakers' scores and Seattle precipitation are indisputably unrelated. Defendant's motion to strike Mr. Neches' regression analysis is denied without prejudice to Defendant's right to file a proper motion *in limine.*

///

---

[3] Notably, although Mr. Neches' analysis revealed a statistically significant positive relationship between cumulative Monday-Thursday demos and cumulative sales, Mr. Neches' still concluded that such demos were not profitable and that it was not commercially unreasonable for Defendant to cease Monday-Thursday demos. Dr. Bucklin's regression analysis also reflects a distinction between the effectiveness of Monday-Thursday demos and Friday-Sunday demos. (Bucklin's Second Rebuttal Report, Doc. 76-4, Ex. D at 7).

**10**

**B.   Motion to Strike Thomas Neches' Damages Calculations**

Plaintiff's damages expert, Mr. Neches, prepared an analysis purporting to calculate lost expected profits and damage to goodwill of Slim-Lite caused by Defendant's alleged breach. Mr. Neches' analysis posits three alternative scenarios. Under Mr. Neches' fist scenario, Defendant would have continued selling Slim-Lite under the terms of the Agreement through 2015. Under Mr. Neches' second scenario, Defendant would have exercised its purchase option in 2006 and then continued selling Slim-Lite through 2015. Under Mr. Neches' third scenario, Defendant terminates the Agreement in 2005, Plaintiff sells Slim-Lite through 2015, and then earns or sells the present value of future profits after 2015.

### 1.   Lost Profits

Defendant correctly contends that Mr. Neches' first two scenarios for projecting lost profits are violative of California law and the court's Memorandum Decision on Defendant's Motion for Summary Judgement ("Memorandum Decision"). (Doc. 36). The Memorandum decision provides, in pertinent part:

> [*Martin v. U-Haul Co. of Fresno*, 204 Cal. App. 3d 396 (1988)] [] applies here and limits Citri-Lite's recoverable damages. Cott properly terminated the Agreement without cause by providing Citri-Lite, in October 2005, a sixty-day advance written notice that it was terminating the Agreement. (Doc. 40 at 52- 23, 64).
> After that sixty-day notice period elapsed, the Agreement terminated and Citri-Lite could not reasonably expect further performance or royalty payments from the Agreement beyond that point. At least one, if not more, of Citri-Lite's damages theories, however, projects Cott's sales of Slim-Lite and royalty payments to Citri-Lite through 2015. These damages theories presuppose more than full performance by Cott as limited by the contract's express terms. To the extent Citri-Lite seeks damages for lost royalty payments beyond the termination of the Agreement, Plaintiff is barred from

**11**

> recovering those damages. At oral argument on the motion, Citri-Lite conceded the point, agreeing that *Martin* precludes recovery of lost royalties beyond the term of the Agreement.

(Doc. 65 at 45). Plaintiff tacitly concedes that Mr. Neches did not review or follow the Memorandum Decision in preparing his opinion on lost profits.

Plaintiff attempts to overcome the rule set forth in *Martin* by arguing that (1) the court has broad discretion to admit expert testimony; (2) the court should exercise its discretion to admit Mr. Neches' analysis because Defendant's concealment of its breach makes it difficult at this point in time to ascertan damages. Plaintiff cites a slew of cases, none of which address the analysis contained in the Memorandum Decision. Defendant's conclusory allegation that Defendant's conduct makes it difficult to ascertain damages at this point in time is insufficient to permit the court to ignore its prior ruling, which now constitutes the law of the case, and apposite California precedent which holds that lost profit damages are limited to the term of the contract. *E.g. Martin*, 204 Cal. App. 3d at 409.

Although it is not a clearly articulated argument raised in Plaintiff's opposition, Plaintiff also suggests that Defendant's breach in 2004 (i.e. Defendant's commercially unreasonable handling of Slim-Lite) caused Defendant to later terminate the agreement and thus Defendant's termination of the agreement was itself a harm caused by Defendant's commercially unreasonable conduct. Plaintiff's purported exception would swallow the *Martin* rule, as an aggrieved party could avoid the rule simply by asserting that some antecedent breach of a contract obligation, such as a breach

**12**

of the covenant of good faith and fair dealing, caused their adversary to exercise a termination option.

All three of Mr. Neches' scenarios regarding lost profits are inadmissible to ascertan lost profit damages, as all three incorporate projections of lost profits inuring after the contract term in violation of the *Martin* and the Memorandum Decision.

**2. Lost Goodwill**

**a. Mr. Neches' Damages Scenarios and Goodwill Calculation**

Plaintiff argues that even if it is limited to lost profits realized during the contract term, Mr. Neches lost profits projections are relevant to the issue of damage to Slim-Lite's goodwill, as damage to goodwill is calculated by comparing the present value of expected future sales and profits with the actual present value of expected sales and profits at the time the parties agreement terminated. (Updated Neches Report, Doc 76-1, Ex. A at 4). Assuming Plaintiff's argument is correct, Mr. Neches' lost profit projections are only relevant to the issue of damage to Slim-Lite's goodwill to the extent such projections are sound. Because Mr. Neches' first two scenarios are based on the unfounded assumption that Defendant would have continued to sell Slim-Lite past the contract term, they are not relevant to determining damage to Slim-Lite's goodwill. As stated in the Memorandum Decision: "[t]o the extent the goodwill damages Citri-Lite seeks are premised on Cott's performance beyond the termination of Agreement, Citri-Lite is barred from recovering those damages." (Doc. 65 at 46).

Unlike his first two scenarios, Mr. Neches' third lost profit scenario does not assume continued sales by Defendant of Slim-Lite

**13**

through 2015. Rather, Mr. Neches' third scenario assumes that Plaintiff would have continued to sell Slim-Lite (goodwill untarnished) itself from 2005 to 2015. Evaluating the value of Slim-Lite's goodwill based on projected profits Plaintiff could have received selling Slim-Lite itself from 2005 through 2015 had Defendant not damaged Slim-Lite's goodwill appears reasonable. Conceptually, the lost profit projections provided in Mr. Neches' third scenario are relevant to ascertaining damage to Slim-Lite's goodwill, but only to the extent that such projections are sound. The substantive merits of Mr. Neches' analysis can be explored *in limine*.

### b. Mr. Neches' Goodwill Calculation

Defendant complains that Mr. Neches' goodwill calculation is flawed because it does not follow the legally-recognized formula for calculating goodwill. Specifically, Mr. Neches failed to subtract the value of Plaintiff's net-assets at the time of breach. (Doc. 76, Motion to Strike at 9). Plaintiff responds that Mr. Neches did not subtract net-assets because Plaintiff had "few tangible assets" and thus Slim-Lite's goodwill accounted for "virtually the entire value of the company." (Doc. 80, Opposition at 21). Plaintiff also disputes the notion that there is only one legally acceptable formula for calculating goodwill.

Mr. Neches' own statement in his Updated Rebuttal Report states that net assets should be subtracted from expected profits in calculating goodwill. Mr. Neches should have endeavored to value Plaintiff's "few tangible assets" at the time of breach. There may be a valid explanation for Mr. Neches' decision, but none is provided. A more thorough inquiry is required before Mr.

**14**

Neches' goodwill valuation is excluded in whole or in part. Defendant's arguments are best addressed in the context of a motion *in limine*.

**ORDER**

For the reasons stated, Defendant's Motions to Strike are DENIED, without prejudice to the filing of motions *in limine* in accordance with applicable local rules and the Federal Rules of Evidence.

IT IS SO ORDERED.

**Dated:   January 25, 2011**            **/s/ Oliver W. Wanger**
                                         UNITED STATES DISTRICT JUDGE