UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| THE CITRI-LITE COMPANY, a California corporation,<br><br>          Plaintiff,<br><br>             v.<br><br>COTT BEVERAGES, INC., d.b.a, Cott Beverages U.S.A., a Florida Corporation, and DOES 1 through 25,<br><br>          Defendants. | 1:07-cv-01075 OWW DLB<br><br>FINDINGS OF FACT AND CONCLUSIONS OF LAW FOLLOWING BENCH TRIAL |

## I. INTRODUCTION.

Plaintiff The Citri-Lite Company ("Citri-Lite"), represented by David J. Cooper and James M. Duncan from Klien, DeNatale, Goldner, Coop, Rosenlieb, LLP, proceeds with this action against Cott Beverages Inc., d.b.a. Cott Beverages U.S.A. ("Cott"), represented by David C. Scheper and Gregory A. Ellis from Scheper Kim & Harris, LLP, for breach of contract. Citri-Lite contends Cott breached both the express and implied terms of a license agreement by failing to promote the licensed products

1

in a commercially reasonable manner. Cott denies the allegations.

An eight-day bench trial, which included the testimony of five live witnesses and several more via deposition testimony,[1] concluded with closing arguments on August 30, 2011. The case was then submitted for decision. Plaintiff and Defendant submitted proposed findings on August 24, 2011. ECF Nos. 148, 149.

## II. FINDINGS OF FACT

A.  Jurisdiction.

1.  Plaintiff Citri-Lite is a California corporation with its principal place of business in Grass Valley, California. Defendant Cott is a Georgia corporation with its principal place of business in Tampa, Florida. The parties are of diverse citizenship and the amount in controversy is in excess of $75,000.00 exclusive of interest and costs. Diversity jurisdiction exists under 28 U.S.C. § 1332.

B.  The Parties.

2.  Plaintiff Citri-Lite was incorporated in 1996 to produce and market "Slim-Lite," a non-carbonated, zero calorie, fruit flavored diet drink designed to help support weight loss. Statement Undisputed Facts ("SUF") No. 4.

3.  Citri-Lite owns Federal Trademark Registrations in the Slim-Lite brand name. *See* Joint Ex. 1.

---

[1] On the last day of the presentation of evidence, the parties stipulated to submit certain deposition testimony in lieu of reading the testimony into the record. *See* Trial Tr.1521:5-1523:12, July 19, 2011.

4.   Citri-Lite operated a website having the domain name Slim-Lite.com which was transferred to Cott. Joint Ex. 1.

5.   George Horrigan is Citri-Lite's president and has worked in the beverage industry since the mid-1950s. He has experience marketing branded beverages since the 1960s and has worked with financial staff in setting goals and evaluating the effectiveness of marketing efforts.

6.   Ed Flynn is Secretary/Treasurer of Citri-Lite and is co-owner with Mr. Horrigan.

7.   Randy Reeser acted as a broker for Citri-Lite from 2000 through 2003, marketing Slim-Lite primarily to the warehouse club chain, Sam's Club.

8.   Cott produces and distributes beverages, including carbonated soft drinks, sparkling and flavored waters, energy drinks, juices, juice drinks, ready-to-drink teas, and other non-carbonated beverages.

9.   Jason Nichol was Cott's Vice President for customer and business development and oversaw Cott's business with Wal-Mart and Sam's Club during the period in which the License Agreement was in effect.

10.   Rob Scheiderer was Cott's Director of Sales. Mr. Schiederer became Director of Marketing and Category Management in January 2005 until March 2006.

11.   Charles Calise became a Marketing Manager at Cott in

December 2003. He was responsible for control of branded

beverages, including Slim-Lite.

    12.  Doug Covington was employed by Cott from May 2001 to

fall, 2006. Mr. Covington was Cott's principal contact with Sam's

Club buyer Jim Dragovich regarding the distribution of Slim-Lite

until Becky Fields took over as buyer.

    13.  Richard De La Cruz was Cott's Director of Sales and

Cott's representative responsible for the distribution of Slim-

Lite to Wal-Mart.

    14.  Larry Thompson was the Cott representative responsible

for the distribution of Slim-Lite to Food Lion. Mr. Thompson was

Cott's principal contact with Mike McGlothlin, who was a food

broker for a company named Crossmark regarding the distribution

of Slim-Lite at Food Lion.

C.   Initial Development and Distribution of Slim-Lite (1990s –
     2003).

    15.  Citri-Lite was originally formed to sell concentrate of

Slim-Lite to bottlers, and started production in 1996-1997 with a

7-Up bottler in Wyoming. Trial Tr. 69:2-18, Jun. 30, 2011. This

undertaking ultimately failed.

    16.  Citri-Lite then developed four flavors of a non-

carbonated beverage, which was distributed through National

Beverage Company. Trial Tr. 69:21-71:15, Jun. 30, 2011.

Citri-Lite had no direct involvement with any of the marketing or

4

promotional efforts implemented by National Beverage Company.

17.   National Beverage Company sold the product to Costco and Sam's Club. In approximately 1999, this endeavor also failed and Slim-Lite was removed from stores. Trial Tr. 72:2-8, Jun. 30, 2011.

18.   Citri-Lite brought on Mr. Reeser in late 1999 as an independent contractor to gain distribution of Slim-Lite at large retailers. Trial Tr. 74:9-75:24, Jun. 30, 2011.

19.   Slim-Lite was tested at Wal-Mart stores in 2002, but was removed from the stores after less than six months. Trial Tr. 731:16-732:14, July 7, 2011.

20.   Citri-Lite's Slim-Lite business operated at a loss between 1996 – 2002 and made a profit in 2003. SUF No. 5; Joint Ex. 131.4.

a.   In 2001, Citri-Lite operated at a loss of 10% of gross sales, or negative ($40,5658.02).

b.   In 2002, Citri-Lite operated at a loss of 4% of gross sales, or negative ($84,084.28).

c.   In 2003, Citri-Lite made a profit of 6% of gross sales, or plus $252,217.87.

21.   In Slim-Lite's profitable year, Mr. Horrigan received a $3,000 per month salary. Mr. Reeser was paid total compensation of gross sales less marketing and freight. Joint Ex. 131. Mr. Flynn was paid no salary, but received a return of his capital

contribution. Trial Tr. 119:1-10, July 1, 2011.

22.  John Carson, Plaintiff's marketing expert, considered the growth from 8,000 cases in 2000 to almost 700,000 cases in 2003 "stellar." Tr. 857:25-858:2, July 8, 2011.

23.  Citri-Lite's primary marketing approach for Slim-Lite at Sam's Club was the use of in-store demonstrations, known as "samplings" or "demos." *See, e.g.*, Trial Tr. 394:17-395:8, July 6, 2011. (Horrigan). When a product is "demo'd" at Sam's Club, shoppers are offered a free sample of the product.

24.  Plaintiff emphasizes that its sales volume reached 700,000 cases in 2003.  The net profit on those sales for 2003 was not as much as the annual royalty of $350,000 per year which Cott was committed to pay whether or not Cott sold a single case of Slim-Lite case in a given year. Tr. 390:18-20, July 6, 2011 (Horrigan). This guaranteed royalty payment provided protection for Citri-Lite assuming *arguendo* "the product was ignored and sales [took] a major drop." Joint Ex. 146. Further, the .80¢ per case marketing fee was also required to be paid by Cott on every case sold. Joint Ex. 1.

25.  By the end of 2002, demos were conducted between two and four times per month. *See, e.g.*, Trial Tr. 115:16-18, July 1, 2011 (Horrigan); Joint Ex. 140.

26.  Citri-Lite did not perform any market share analyses measuring the customer recognition or market share, customer

6

loyalty or acceptance, and/or any economic appraisal of the value
of the Slim-Lite brand before 2003. Trial Tr. 1332:25-1333: 21,
1334:21-1335:2, July 19, 2011 (Neches).

D.    The License Agreement.

    27.  On September 17, 2003, Mr. Horrigan agreed to
exclusively license Slim-Lite to Cott by assigning to Cott all
manufacturing, production, distribution, sales, and marketing.
The terms and conditions included: (1) a royalty rate of $.50 per
case; (2) that Cott maintain the current level of marketing
support Citri-Lite was providing; and (3) some method to protect
Citri-Lite if "the product was ignored and sales took a major
dip." Joint Ex. 1; Joint Ex. 146.

    28.  On December 28, 2003, the parties incorporated these
terms into its written Intellectual Property License and Purchase
Option Agreement (the "Agreement"). The Agreement's "effort to
sell" clause states:

> 2.4 Licensee's Effort to Sell. During the Term, Licensee
> will spend on average over each rolling twelve (12) month
> period during the Royalty Term the sum of Eighty Cents
> ($.80) per Case of Product sold by Licensee during such
> rolling twelve (12) month period to market the Products.
> Licensee shall otherwise use commercially reasonable efforts
> to promote and sell the Products so as to maintain and
> enhance the value of the goodwill residing in the
> Intellectual Property and to produce the maximum amount of
> Royalty under this Agreement consistent with the quality
> control provisions of this Article 2.

Joint Trial Ex. 1, at 4.

7

29.   The Agreement defines "Case" as "the quantity of twelve (12) containers of the product, where each container holds twenty (20) ounces or any configuration of containers." Joint Trial Ex. 1, at 2.

30.   "Intellectual Property" is defined as the trademarks for the Slim-Lite brand, the website used to market Slim-Lite, and the specific formulations, manufacturing, mixing and packaging instructions used to produce and package Slim-Lite. Joint Trial Ex. 1, at 2.

31.   "Goodwill" is not defined in the Agreement, but Mr. Carson testified that the phrase "maintain and enhance the value of the goodwill of the brand" is commonly understood to mean "build the brand" and not harm the brand. Tr. 891:8-24, July 8, 2011. This must be balanced with a company's right to consider its own business interests. *See, e.g.*, *Metavante Corp. v. Emigrant Sav. Bank*, 619 F.3d 748 (7th Cir. 2010).

32.   "Commercially reasonable efforts" is not defined. Defendant's expert, Randolph Bucklin, testified that marketing effort need not be successful in order to be commercially reasonable because all marketing actions involve risk. Tr. 1051:25-1052:13, July 12, 2011.

33.   The Agreement does not contain a "best efforts" clause. Within the beverage industry, it is understood that a "best efforts" clause imposes a higher standard of performance than a

"commercially reasonable efforts" clause.

34.   Section 2.4 of the Agreement does not reference demos, nor does it set forth any specific marketing program or performance standards.

35.   Mr. Horrigan was extremely experienced, knowledgeable and sophisticated in beverage marketing, yet despite assigning over the entirety of the marketing, sales, distribution and production of Slim-Lite to Cott, he did not ask to include definite performance standards, finite sales goals, defined reporting times, or a specific marketing plan.

36.   The parties' negotiations solely focused on the monetary amount Citri-Lite had been spending on demos in coming to agreement on an overarching, generalized 80-cent-per-case marketing expenditure requirement for whatever strategies and efforts Cott would later employ. *See* Trial Tr. 394:17-395:8, July 6, 2011.

37.   Mr. Horrigan agreed that "from a business perspective, [] *taking [Mr. Horrigan's] business experience into account, this [Agreement] included all the business points that. . . were needed.*" Trial Tr. 383:11-384:6, July 6, 2011 (Horrigan) (emphasis added). Mr. Horrigan further testified that the parties' Agreement was not similar to a franchising agreement in that no "unique marketing or unique advertising or packaging. . . would have to be protected and quality maintained subject to

inspection." Trial Tr. 144:9-14, July 1, 2011 (Horrigan).

38.  Section 3.1 of the Agreement required Cott to pay Citri-Lite a royalty in the amount of fifty cents per "Case" of Slim-Lite sold, as the term "Case" is defined in the Agreement. Section 3.1 further specified that the amount of royalty would be prorated if Slim-Lite were sold in packaging configurations totaling other than 240 ounces. Joint Trial Ex. 1, at 4.

39.  Section 3.2 of the Agreement required Cott to pay Citri-Lite a minimum royalty of $350,000.00 for each year of the contract term. Joint Trial Ex. 1, at 5. Cott was relieved from the minimum royalty provision under the Agreement only if Sam's Club ceased to offer Slim-Lite as a permanent item during the first year of the Agreement. This did not eventuate and Cott was not relieved from the provision. *Id.*

40.  The minimum annual royalty is more annual profit than Citri-Lite had previously made from Slim-Lite.

41.  There is no requirement in the Agreement regarding the amount or content of Cott's communication with Citri-Lite.

42.  Under Section 8.1, Cott and Citri-Lite each had the right to terminate the Agreement for any reason at any time upon sixty days prior written notice. Joint Ex. 1.

43.  Following execution of the Agreement, Citri-Lite transferred the Slim-Lite.com website to Cott. Trial Tr. 204:5-11, July 1, 2011; Cott took over all roles concerning Slim-Lite.

Trial Tr. 201:8-15, July 1, 2011.

E.   <u>Cott's Marketing Efforts Under the Agreement.</u>

    1)   <u>Overall.</u>

    44.   When Cott entered into the Agreement with Citri-Lite,
248 Sam's Club stores carried Slim-Lite. In 2004, during the
first year of the Agreement, distribution was increased and more
Sam's Clubs began carrying Slim-Lite. By May 2005, however,
distribution was cut dramatically without warning from Sam's Club
and Cott began considering an "exit strategy" from Slim-Lite.

    45.   By October 2005, Cott first informed Citri-Lite that it
intended to terminate the Agreement.

    46.   According to Citri-Lite, before the Agreement expired,
Cott mishandled the marketing of Slim-Lite in at least three
ways, breaching its commitment to use "commercially reasonable
efforts" to promote and sell the product.

    47.   First, in 2004, after Cott took over Slim-Lite, it
continued Citri-Lite's practice of conducting in-store demos of
Slim-Lite at Sam's Club. In 2005, however, Cott reduced and then
stopped all of its demo activity at Sam's Club. According to
Citri-Lite, this slow down and termination of demo activity
negatively impacted Slim-Lite's success at Sam's Club.

    48.   Second, toward the end of 2004, Cott was developing a
"repackaging strategy" for Slim-Lite. In the end, however, the
repackaging change was not implemented despite Sam's Club's

1    request that it be accomplished.

2        49.   Third, while focusing its energy on Sam's Club and Wal-

3    Mart, Cott neglected other retailers, including Food Lion,

4    another merchandiser of Slim-Lite. Citri-Lite contends Cott did

5    not engage in sufficient promotional activity at Food Lion.

6

7        2)   Efforts at Sam's Club (2004 – 2005).

8             a.   The Buyers.

9        50.   During the time Cott marketed Slim-Lite, it worked with

10   two Sam's Club buyers: Jim Dragovich and Becky Fields. SUF No.

11   14.

12       51.   Mr. Dragovich and Ms. Fields had full discretion to

13   modify the distribution of beverages under their respective

14   categories. Both buyers also had discretion to cancel beverages

15   in their categories. SUF No. 15, 16.

16       52.   Sam's Club buyers are "notoriously difficult" to deal

17   with in the beverage industry. Mr. Horrigan agreed that "the

18   buyers at Sam's or Wal-Mart are powerful," and that they "can

19   make you or break you." Trial Tr. 533:14-16, July 6, 2011.

20

21           b.   Demos and Their Effectiveness.

22               (1)  Demo Timeline.

23       53.   Between approximately January and July 2004, Cott

24   employed a consistent, twice-monthly demo program for Slim-Lite

25   at Sam's Club, which was reduced to about once per month

26   thereafter. *See* Trial Tr. 855:1-4, July 8, 2011.

27

28                                    12

54.   Sales of Slim-Lite began to falter and considerably decline during and/or following April 2004, despite the consistent demoing. Def.'s Ex. 420; Pl.'s Ex. 236. According to Slim-Lite's spreadsheet, sales volume in April 2004 was 85,619 while the volume from May through December was approximately 12,000 to 35,000 less than April. Pl.'s Ex. 236.

55.   In November 2004, Cott provided Sam's Club with its planned demo schedule for Slim-Lite in 2005, which set out one demo per month. Joint Ex. 31. Mr. Dragovich did not question the schedule or request that any additional demos be conducted.

56.   Cott ran two demos at all Sam's Clubs in January 2005. Trial Tr. 1079:19-24, July 12, 2011. During January 2005, Slim-Lite was carried at approximately 500 Sam's Clubs nationwide,[2] pursuant to which, Cott ran approximately 1,000 demos. Joint Ex. 20.

57.   Cott contemplated ceasing demos at Sam's Club in or around February 2005, in part due to the impending buyer change from Mr. Dragovich to Ms. Fields. *See* Trial Tr. 1225:6-7, July 12, 2011 (Schiederer) ("Becky [Fields] doesn't like demos."). Cott, which paid from demos, also believed that Sam's Club was running more demos than were authorized. Trial Tr. 1210:10-1211:6, July 12, 2011 (Schiederer).

---

[2] Cott obtained increased distribution from approximately 250 clubs at the time of execution of the Agreement to about 350 clubs on or about October 5, 2004 and over 500 clubs on or about November 14, 2004, due to a price reduction agreement between Cott and Sam's Club.

13

1    58.  The idea to cancel was further motivated by declining

2    sales and the demos' lackluster effect on sales in comparison to

3    their cost. At that time Cott was implementing other marketing

4    endeavors to support and/or replace demo marketing.

5    59.  On or about March 24, 2005, Cott canceled all remaining

6    demos at Sam's Club. Joint Ex. 87.

7

8    60.  After Cott canceled all demos, Cott remained willing to

9    run more demos as necessary to meet the 80 cent per case

10   marketing requirement under the Agreement. Joint Ex. 124.

11   61.  Plaintiff states that Mr. Dragovich believed Cott

12   "backed down" on the demo commitment for Slim-Lite. Mr. Carson

13   drew the inference that Cott's conduct sent a message to Mr.

14   Dragovich and Mr. Dragovich responded by losing interest in Slim-

15   Lite. Tr. 897:13-898:4, July 8, 2011. However, Mr. Dragovich

16   testified it was "not possible" that he reduced the distribution

17   from 560 to 90 stores because of the reduction of demos. Tr.

18   1479:4-24, July 19, 2011.

19

20              (2)  Demo Effectiveness.

21   62.  Throughout 2004, Cott spent in excess of the 80-cent

22   per case marketing requirement by paying for demos at Sam's Club.

23   *See e.g.*, Joint Ex. 47. Mr. Bucklin, Cott's marketing expert,

24   determined that in 2004, Cott spent $1.05 per case of Slim-Lite

25   sold via demos. Trial Tr. 1087:2-9, July 12, 2011.

26   63.  Mr. Horrigan testified that "most demo programs don't

27

28
                              14

pay for themselves. They pay for it over time." Trial Tr. 360:11-15, July 6, 2011.

64.   Mr. Bucklin performed a regression analysis to examine the effects of demos upon sales at Sam's Clubs during the term of the Agreement, as well as the costs and benefits of demos in order to determine if demos were, in fact, paying for themselves over time. Trial Tr. 1044:13-15, 1054:24-1055:7, 1059:3-19, July 12, 2011.

65.   Mr. Bucklin determined the demos did not.

66.   His analysis reviewed all available point-of-sale records for Slim-Lite and all available schedules of demo activities of Slim-Lite during the term of the Agreement. Trial Tr. 1044:13-15, 1054:24-1055:7, 1059:3-19, July 12, 2011.

67.   Mr. Bucklin evaluated demo activity at Sam's Club for three factors: (1) the increase in Slim-Lite sales at Sam's Club during weeks demos were performed; (2) a comparison between the cost of demos and the contribution margin – i.e., the difference between the sale price of the additional cases sold and the variable costs of producing the additional cases – resulting from the increase in sales during demo weeks; and (3) whether demos of Slim-Lite had any "carryover effect" on sales – i.e., whether demos caused sales to increase in follow-up weeks when demos were not run. *Id.* at 1055:8-1057:1, 1070:5-9.

68.   First, Mr. Bucklin determined that demos led to an

increase in sales of approximately 12 cases during the week the demos took place as compared to weeks when demos did not occur. *Id.* at 1055:12-1056:5, 1060:24-1061:3.

69.  Second, Mr. Bucklin concluded that Cott spent, on average, $143 per demo, including both the cost of the demo and the price of Slim-Lite cases purchased to sample at each demo. Mr. Bucklin further concluded that Cott's contribution margin was 23 percent; based on a list price of $5.87, Cott's incremental gain on the 12 additional cases sold per demo was only $16.20.[3] *Id.* at 1056:23-1057:11, 1066:4-1068:3. The cost of a demo to Cott was eight to nine times the contribution margin realized from each demo. *Id.* at 1068:14-17.

70.  Third, Mr. Bucklin acknowledged that despite their costs demos could be a useful marketing activity if they led to increased long-term sales of Slim-Lite, and analyzed the carryover effect of demos. After running analyses on sales both four weeks after a demo and eight weeks after a demo, Mr. Bucklin found that demos did not have any carryover effect on sales of Slim-Lite. *Id.* at 1056:10-22, 1068:18-1069:10. Demos of Citri-Lite did not increase sales in any weeks other than the demo weeks themselves. *See* Def.'s Ex. 420 (Bucklin's graph of the effect of demos on sales showing a "sawtooth" pattern of sales

---

[3] Before October 2004, Cott sold Slim-Lite at a list price of $6.11. During that period the contribution margin to Cott was higher, but a large negative discrepancy still existed between the contribution margin from demos and the cost of demos to Cott.

increases in demo weeks, followed by sales drops in subsequent weeks.)

71.   Mr. Bucklin also ran analyses to determine if demos had differing effects from January through August 2004, when Club distribution was constant, and September 2004 through April 2005, when Sam's Club distribution expanded; these analyses led to the same results across all time periods. Trial Tr. 1069:16-1070:9, July 12, 2011.

72.   While Cott employees did not run a regression analysis at the time of demoing, their testimony indicates that Cott reviewed the costs of demos and their effects on sales.

a.   Mr. Nichol, Cott's Vice President who oversaw Cott's business with Wal-Mart and Sam's Club, e-mailed Mr. Horrigan that demos led to an increase in sales of twenty percent during demo weeks. Joint Ex. 2. Mr. Bucklin confirmed that the twelve-case increase he identified during demo weeks was a twenty percent increase over baseline sales of Slim-Lite. Trial Tr. 1072:10-1073:3, July 12, 2011.

b.   Several Cott witnesses testified that demos did not lead to any long-term increase in sales.

c.   Charles Calise, Cott's Marketing Manager during the time of the Agreement, testified that demos did not create a sustained lift on Slim-Lite sales. Calise Dep., vol. 3 344:8-17.

d.   Gil Woods, Cott's Senior Manager for Sales and

17

Finance during the period of the Agreement, testified that demos did not create a long-term increase in sales, and that Cott was "just essentially buying volume in the weeks when we demo'd." Woods Dep., 61:5-6, 117:24-118:15.

   e. Rob Schiederer, Cott's Director of Sales and later Director of Marketing during the period of the Agreement, designed a "range report" which tracked weekly sales of Slim-Lite at Sam's Clubs. Joint Ex. 20. Reviewing his range report, Mr. Schiederer testified: "you did a demo, and it would spike, and then the following week, it would drop, and then it would spike, and then it would drop . . . . It wasn't sustaining. Usually, when you promote, you want to continue to increase the top line sales, and the hard thing about Slim-Lite was that it was just like that." Trial Tr. 1231:5-13, July 12, 2011.

 73. Demos were not creating short term profits or increased long-term sales.

 74. Cott is entitled to consider its economic interests when evaluating marketing options. Mr. Horrigan conceded that it was appropriate for Cott to consider its costs and ultimate profitability when assessing demos and continued interest in Slim-Lite. Trial Tr. 355:20-23, July 6, 2011.

 75. Citri-Lite's marketing expert, Mr. Carson, also agreed that the Agreement did not amount to a "blank check" with regard to demo spending. Trial Tr. 931:8-12, July 8, 2011 (Carson).

76.   Neither Mr. Dragovich nor Ms. Fields required suppliers to run demos of their products at Sam's Club. Trial Tr. 1463:13-1464:3, July 19, 2011 (Dragovich); Fields Dep., 117:5-9.

c.   Marketing Alternatives to Demos.

77.   Ms. Fields testified that she has "plenty of products that don't demo on a regular basis." Fields Dep. 135:25-136:3, July 15, 2008.

78.   Mr. Bucklin identified other marketing alternatives to demos. Trial Tr. 1080:22-1081:6, July 12, 2011.

a.   The very presence of Slim-Lite at Sam's Club had a positive marketing effect because Sam's Club is known to be selective in the products it chooses to distribute. Trial Tr. 1096:3-15, July 12, 2011.

b.   Increasing distribution of a beverage to more stores with a single retailer, and obtaining distribution in new retail chains, are recognized marketing mechanisms. Trial Tr. 1048:14-18; 1082:19-21, July 12, 2011.

c.   Reducing the price of Slim-Lite at Sam's Club would also have a positive marketing effect, assuming that price was passed down to Sam's Club's retail customers. Trial Tr. 1048:10-13, 1049:3-4, July 12, 2011. Mr. Horrigan recognized this as well. Trial Tr. 350:2-4; 425:3-8, July 6, 2011 (agreeing that "another factor that goes into the marketing of the beverage is the price" and that "reducing a list price and reducing your own

19

profits per case is something that's intended to help the brand.")

         d.   <u>Price Reduction Gains Nationwide Distribution.</u>

     79.  In July 2004, Cott obtained an opportunity to expand distribution of Slim-Lite at Sam's Club to full distribution nationwide, over 500 clubs.[4] Joint Ex. 2 (July 5, 2004 e-mail from Mr. Nichol to Mr. Horrigan).

     80.  Reducing price as a means to increase distribution represented a three-pronged opportunity for Citri-Lite and Cott.

         a.  First, the product gained increased distribution at Sam's Club, by virtue of selling at a lower price.

         b.  Second, price reduction to customers increases the appeal of Slim-Lite to consumers and the sales volume of Slim-Lite would be expected to improve assuming, as was Sam's Club policy, that the price reduction was passed down to the retail level. Trial Tr. 1098:18-1099:8, July 12, 2011 (Bucklin).

         c.  Full distribution also created access to additional promotional vehicles not available to companies with partial distribution at Sam's Club and could prevent competitor beverages from gaining a foothold at Sam's Club. Trial Tr. 1095:10-23, July 12, 2011 (Bucklin).

     81.  Cott informed Mr. Horrigan that Sam's Club asked for

---

[4] Despite that Plaintiff's and Defendant's exhibits show that sales of Slim-Lite were declining around this time, sales must have been meeting Mr. Dragovich's expectations, at least enough to justify an increased distribution *if* a price cut was agreed to, and notably not, e.g., if demos were increased.

cost reductions in return for providing nationwide distribution of Slim-Lite. Cott requested permission to use the $0.80 cent-per-case marketing allowance to lower the cost of Slim-Lite. Joint Ex. 2.

82.   Mr. Horrigan agreed to Cott's request, replying to "go ahead" and noting that "finally" Slim-Lite would be sold in California. *Id.*

83.   Mr. Horrigan believed, however, that demoing would continue. *See* Joint Ex. 10 (Nov. 14, 2004 email stating "I would like your permission to use the $0.80 per case marketing allowance against the cost. We will still support the product with demos regularly.")

84.   On the stand, Mr. Horrigan testified that although he agreed to the price reduction, he "wouldn't -- if it was a question of we are going to go national with this product and there will be no marketing support, the answer would have been absolutely no. Price alone in this case is not going to make the brand." Trial Tr. 439:14-17 July 6, 2011.

85.   Although adamant on the stand regarding demoing, Mr. Horrigan's email responses tell a different story. There is no evidence that Mr. Horrigan inquired into whether demoing would continue at the twice per month rate, or at any rate, with the marketing allowance then being used in whole or part against cost. Mr. Horrigan simply responded: "Use the 80cents [sic] to

get a $2.00 price for a 4 pack." Joint Ex. 11.

86.   Notwithstanding the confusion surrounding whether and at what frequency demos would continue, Cott continued to demo Slim-Lite and contemporaneously reduced the list price of Slim-Lite to Sam's Club from $6.11 per case to $5.87 per case, effective October 4, 2004. Def. Ex. 414 [Cott Accounts Receivable Deal Sheet].

87.   On October 5, 2004, Slim-Lite was in "350 [Sam's] Clubs vs. 250 when [Cott] took it over." Joint Ex. 51.1.

88.   Peak distribution of Slim-Lite at Sam's Club occurred in December 2004 under Cott's control when the beverage was available in 528 stores. SUF No. 30; Joint Ex. 20.

        e.   Experts' Opinions Re: Increased Distribution.

89.   Mr. Carson, Plaintiff's beverage marketing expert, testified that a retail price reduction paralleling the twenty-four cent list price reduction from $6.11 to $5.87 amounted to a four percent reduction and would be immaterial in increasing retail sales. Trial Tr. 1021:8-12, July 8, 2011 (Carson).  His testimony explained:

> Q. With respect to the 4 percent, 24 cent or 4 percent decrease, and in terms of its potential effect on sales of Slim-Lite, would you characterize that as a -- or can you characterize that as a significant decrease?
>
> A. No.

*Id.*

90.   Defendant's expert, however, explained that marketing

academics have analyzed consumer responses to retail price reductions for several decades, using point of sale data for hundreds of product categories in dozens of different settings. Trial Tr. 1099:23-1101:2, July 12, 2011 (Bucklin). Based on that data, a four-percent reduction in retail pricing of consumer goods generally results in a ten-percent increase in retail sales volume. *Id.*

91.  Ultimately, a retail price reduction was not realized, but it is undisputed that this was not Cott's fault.[5] The step to implement a retail-level price reduction was a reasonable effort by Cott to market and sell Slim-Lite.

92.  Cott bore the costs of the list price reduction, as the marketing allotment was still in whole or in part being used to demo, including 1,000 demos in January 2005.

93.  Without the benefit of retail-level reduction and increased sales volume, Cott's economic interests in continuing to market and sell Slim-Lite were limited by the buyers' conduct not within Cott's control.

---

[5] Mr. Dragovich failed to pass down the list price reduction to the retail level throughout his time as buyer, despite Sam's Club policy to pass down price reductions. Trial Tr. 1494:15-24, July 19, 2011 (Dragovich's testimony that passing down a list price reduction is Sam's Club policy and a claim that a buyer failed to pass down a list price reduction is a serious charge); Joint Ex. 94.1-.3 (spreadsheet showing no retail-level price reduction); Joint Ex. 166 (attachment to Mr. Dragovich Decl. demonstrating no retail-level price reduction); Trial Tr. 433:15-434:3 (Horrigan agreeing that Mr. Dragovich "didn't change the retail price of Slim-Lite at Sam's Club."). It is undisputed that the failure to pass down the price was Mr. Dragovich's error and not Cott's. Both parties agree that the buyer has complete control over the retail price of products sold at its clubs. *See e.g.*, Trial Tr. 426:19-24, July 6, 2011 (Horrigan agreeing "that's something Cott can't dictate.")

1

        **f.**   **Cott's Efforts to Implement a Packaging Change.**

2

     94.  A change in packaging configuration to a 24-pack of

3

16.9-ounce bottles, using "registered wrap"[6] was "something

4

[Sam's Club] [was] asking [] suppliers to look at." Trial Tr.

5

1469:22-23, July 19, 2011 (Dragovich). However no one bottle size

6

is reasonable in all situations or a guarantee of success.  Trial

7

Tr. 350:20-23, 351:4-7, July 6, 2011 (Horrigan); Trial Tr.

8

957:20-958:10, July 8, 2011 (Carson).

9

     95.  In the fall of 2004 Cott considered converting to a 24-

10

pack of 16.9-ounce bottles using registered wrap and/or a 24-pack

11

of 20-ounce bottles. Joint Ex. 4 (Cott Product Approval Form);

12

Trial Tr. 1202:17-1203:6, July 12, 2011 (Schiederer); Pls. Ex.

13

212 (December 7, 2004 email referring to "20x24 which Rob wants

14

to pursue ASAP").

15

16

     96.  The buyer at Sam's Club has discretion to approve any

17

change in a product's packaging and both parties agree it is

18

reasonable to obtain the buyer's support before implementing a

19

packaging change. Calise Dep., vol. 137:9-22; Trial Tr. 1462:22-

20

1463:7, July 19, 2011 (Dragovich); Trial Tr. 453:5-10, 454:16-19,

21

July 6, 2011 (Horrigan).

22

23

     97.  Effecting a change from a 20-ounce bottle to a 16.9-

24

ounce bottle for Slim-Lite would have involved multiple steps,

25

26

---

[6] "Registered wrap" is a form of plastic wrapping in which multicolored
graphics are printed onto the identical location on each package. Trial Tr.
225:6-12, July 1, 2011 (Horrigan); Trial Tr. 1197:10-18, July 12, 2011
(Schiederer).

27

28

including: (1) developing a new tray; (2) designing a new label via an external vendor; (3) developing a die line for the new package; (4) incorporating any comments from Mr. Horrigan regarding the new design; (5) confirming regulatory and legal compliance for the new label; (6) working with an outside vendor called a separator to develop printing plates for the label; (7) contracting with an outside printer to print the labels; and (8) implementing a five-day quality control hold to ensure that the product in the new bottle does not have any microbial issues.  Calise Dep., vol. 2, 135:5-137:8. A bottle-size change would also have affected the costs of the bottle, the closure, the tray size, the label, the ingredients, manufacturing, and freight. Woods Dep., 93:13-94:10 (noting that "every line item on the P&L would change" due to a change in bottle size).

98.  Similarly, effecting a change to registered wrap for Slim-Lite would also have involved multiple steps, including: (1) developing a new die line for the tray; (2) developing a new die line for the registered wrap; (3) identifying a supplier for purchasing the registered wrap; (4) identifying a supplier for printing the registered wrap; (5) an evaluation of Cott's manufacturing capability to determine if it could apply the shrink over the package; (6) developing graphics; (7) obtaining legal and regulatory approval of the graphics; (8) separation of

25

graphics and printing of the material; (9) scheduling of line times and production; and (10) a five-to-seven day quality control hold. Calise Dep., vol. 3, 333:13-334:20.

99.  For Cott to purchase a registered wrap machine, it would need to have been part of a capital expenditure budget, which would needed to have been approved by Cott's Vice President of Manufacturing. Woods Dep., 97:8-17. To get approval Cott needed to: (1) review the cost of the purchase and compare it to the profit that the machine would generate; (2) determine the volume of product to be sold over an expected time frame; (3) determine the contribution margin expected to be generated by the product; and (4) perform a discounted cash flow analysis to calculate an internal rate of return and net present value. The expenditure would need to be approved by either Mr. Nichol or Cott's Chief Financial Officer, depending on the result of the analysis.  *Id*. at 97:18-98:14.

100. Implementing a packaging change to a 24-pack of 16.9-ounce bottles using registered wrap would take Cott up to six months. Calise Dep., vol. 3 335:3-5; Trial Tr. 900:5-10, July 8, 2011 (Carson).

(1)  <u>Why the Packaging Change Was Not Implemented.</u>

101. The packaging change was not implemented for the following reasons:

a.   Cott attempted a 16.9-ounce bottle for Slim-Lite

in conjunction with its nationwide rollout of Slim-Lite at Wal-Mart Supercenters at the beginning of 2005. Joint Ex. 100.2; Trial Tr. 1503:2-5, July 19, 2011 (De La Cruz).  That rollout was unsuccessful. *Id*. The lack of success of the 16.9-ounce bottle at Wal-Mart entered into Cott's analysis regarding effecting a change.

b.    The change would create "less than acceptable gross margins at the list [] price." Joint Ex. 57.1. Mr. Horrigan agreed to amend the Agreement to adjust the margins, but the amendment was never executed. Joint Ex. 122.

c.    Ms. Fields did not have an opinion regarding whether the change would increase sales and did not require the change. *See* Fields Dep. 62:20-24.

d.    The extended time to it took to conclude the buyer change at Sam's Club in 2005[7] and the need for the buyer to approve any change. Calise Dep., vol. 2, 144:18-145:4; Trial Tr. 1232:8-19, July 19, 2011. Cott actively pursued the change as well as approval from Ms. Fields and Mr. Horrigan. *See* Joint Ex. 92 (July 27, 2005 presentation to Ms. Fields about Slim-Lite including receiving her approval of the change); Joint Ex. 103 (September, 2005 email indicating that the change was still in progress); Joint Ex. 25 (November 2005 email regarding a meeting Cott had with Ms. Fields about the change.) However, final

---

[7] On March 30, 2005, Ms. Fields confirmed to Cott that she would become the buyer for Slim-Lite at Sam's Club. SUF 33, Joint Ex. 61. The buyer transition took several months and still was not complete by June 2005. Joint Ex. 42.

approval was not achieved from Ms. Fields until a month after notification of termination of the contract.

      3)   <u>Cott's Efforts at Food Lion (Dec. 2003 – Fall, 2004).</u>

          a.   <u>Marketing efforts.</u>

102. Just prior to the execution of the Agreement, Mr. Horrigan was contacted by Mike McGlothlin, who worked for a food broker, Crossmark, regarding distributing Slim-Lite through the Food Lion grocery store chain. Trial Tr. 185:10-186:6, July 1, 2011.

103. The contract with Cossmark was assigned to Cott. Trial Tr. 194:4-10, July 1, 2011.

104. Through Crossmark, Food Lion requested a wholesale price of $10.20 per case of 24 twenty-ounce bottles. Trial Tr. 190:23-191:20, July 1, 2011 (Horrigan).

105. Mr. Thompson of Cott considered this price a "dead net cost." "Dead net cost" means that the supplier (Cott) had invested all monies into the cost of the good and there is no additional funding for marketing. Thompson Dep., 93:25-94:3; McGlothlin Dep. 51:1-8.

106. The wholesale price was agreed upon in order to meet Food Lion's marketing strategy of an "everyday low price" ("EDLP"). Under an EDLP marketing approach, a retailer seeks to put in place a consistent low price for retail customers, as opposed to focusing on price promotion efforts. Trial Tr.

1102:22-1103:8, July 12, 2011 (Bucklin); Dep. Mr. Calise, vol. 2, 198:21-199:3.

107. Despite the low margins of wholesale pricing, Cott ran two MVP price promotions of Slim-Lite at Food Lion.[8] Joint Ex. 79; Joint Ex. 82; McGlothlin Dep. 30:25-31:11. Cott supported at least one of the two MVP promotions with a weekly advertisement. Joint Ex. 77. Consumers did not appear to repurchase Slim-Lite after the first MVP promotion, and the second promotion was not successful. McGlothlin Dep., 30:25-31:11.

108. Cott also ran a wing display of Slim-Lite at all Food Lion stores in conjunction with one of the two MVP promotions. Joint Ex. 17; Thompson Dep. 103:8-21. Cott incurred a cost of 30 cents per 4-pack to run the wing displays. *Id.*

109. Cott obtained regular placement of Slim-Lite at Food Lion in the diet section of the store, shelved next to Slim-Fast. Joint Ex. 80; Thompson Dep., 97:10-15. This placement had good visibility and it was in favorably placed next to a popular national brand product. Thompson Dep., 97:10-98:3.

110. When Cott began distributing Slim-Lite in early 2004, it was sold in approximately 800 Food Lion stores. SUF No. 28. In May 2004, distribution increased to all of Food Lion's approximately 1,200 stores. Joint Ex. 78; Joint Ex. 80; Joint Ex. 154.4; Thompson Dep., 38:23-39:10, 40:2-6.

---

[8] Notably during 2004, while Slim-Lite was contemporaneously sold in Sam's Club, Cott was also spending more than the $0.80 per case marketing allocation for demos at Sam's Club. Trial Tr. 932:16-21, July 8, 2011 (Carson).

111. Food Lion eventually decided to discontinue Slim-Lite in mid-2004. Mr. McGlothlin understood that Food Lion discontinued Slim-Lite because the product did not sell at a rate that justified the amount of shelf space devoted to the product. McGlothlin Dep., 55:21-56:7.

112. Mr. Bucklin testified that at Food Lion, Cott did not run in-store promotional efforts, but the product was succeeding without need for demos. Tr. 1079:4-7, July 12, 2011 (Bucklin).

113. Mr. Carson testified that Cott's efforts at Food Lion were ineffective because based on his reading of the record there was "inactivity between the Cott salespeople and the broker who was handling the account. . . . [A]s far as I could tell from the record, they never spoke or dealt with each other directly on items." Trial Tr. 903:24-904:2, July 8, 2011.

114. Mr. Carson's opinion, however, is contradicted by the evidence presented at trial as demonstrated below.

115. Ultimately Mr. Carson's opinions which were "old school" and not founded in modern marketing science, economics, or quantifiable approaches were less persuasive than Mr. Bucklin's opinions.

       b.   Communication Between Cott and Crossmark.

116. Crossmark views manufacturers of product as its clients. McGlothlin Dep. 11:18-23.

117. Mr. Thompson intended that Mr. McGlothlin take the lead

in working with Food Lion, since Mr. McGlothlin had a relationship with the Food Lion category manager. Thompson Dep., 21:3-16.

118. Mr. McGlothlin opined that he typically meets with clients face-to-face. McGlothlin Dep. 39:18-40:11. Mr. Thompson and Mr. McGlothlin never met in person, but frequently communicated over the phone. Thompson Dep., 27:1-3 ("It was fairly simple and straightforward as to the way things were set up. We did a lot of business on – on the phone.")

    4)   Cott's Efforts at Wal-Mart (Mar. 2004 – Spring 2005).

119. In March 2004, Cott obtained a regional test of Slim-Lite at approximately 300 Wal-Mart stores. Joint Ex. 98; Trial Tr. 1498:2-23, July 19, 2011 (De La Cruz). Mr. De La Cruz, Cott's Director of Sales, spent 60 to 80 hours obtaining and overseeing the test, and his team spent a total of 1,000 to 1,500 hours in connection with the test. Trial Tr. 1499:8-21, July 19, 2011 (De La Cruz).

120. An in-store demo of Slim-Lite was conducted at each of the Wal-Mart stores carrying Slim-Lite in connection with the test. Trial Tr. 1499:4-6, July 19, 2011 (De La Cruz).

121. The test was apparently not successful, as the Wal-Mart buyer, Brian Johnson, resisted performing another test of Slim-Lite. Trial Tr. 1502:24-25, July 19, 2011 (Mr. De La Cruz opining that Johnson was resisting based on "[o]verall sales performance

to warrant shelf space, flavor mix, and number of SKU's, most appropriate pack size.")

122. Mr. De La Cruz's efforts overcame this resistance and in October 2004, Johnson approved a nationwide modular test of Slim-Lite at all 1,500 Wal-Mart Supercenters. Joint Ex. 100 (Dec. 8, 2004 e-mail from Steve LeVeau of Cott to other Cott personnel); Trial Tr. 1502:12-17, July 19, 2011 (De La Cruz).

123. Cott used a 16.9 ounce bottle size for Slim-Lite in its nationwide rollout at Wal-Mart in January 2005. Joint Ex. 100.2; Trial Tr. 1503:2-5, July 19, 2011 (De La Cruz).

124. The national rollout of Slim-Lite at Wal-Mart included favorable placement of the product in "Action Alley," a series of free-standing displays located in a main aisle in the food section of each Wal-Mart Supercenter. Trial Tr. 1505:17-1506:12, July 19, 2011 (De La Cruz); Trial Tr. 1002:16-20, July 8, 2011 (Carson stating that Action Alley "generally is the most desirable spot to move products rapidly" at Wal-Mart.)

125. Cott spent nearly $150,000.00 and 500 hours on demoing Slim-Lite in conjunction with the rollout. Joint Ex. 101 (invoice for $133,604.05 for portion of January 6, 2005 Wal-Mart demo of Slim-Lite); Joint Ex. 65.3 (identifying payments of $133,604.05 and $16,259.86 for January 6, 2005 Wal-Mart demo of Slim-Lite); Trial Tr. 1504:17-22, July 19, 2011 (De La Cruz).

126. Wal-Mart was not pleased with Slim-Lite's sales and

moved the product onto "rollback" status and discontinued the

Slim-Lite rollout within three months. Trial Tr. 1518:5-7, July

19, 2011 (De La Cruz); Joint Ex. 33 (Feb. 2, 2005 e-mail from Mr.

Horrigan to Flynn: "Wal-Mart is not happy with the turnover and

has asked for a permanent 'ROLL BACK' to 2/$1.98.").

127. The rollback was not due to any shortcoming or failure

by Cott. Cott invested time and additional dollars into the Wal-

Mart rollout effort.

128. Cott agreed to place Slim-Lite on rollback, and

absorbed the cost of doing so, but the product still did not

sell. Joint Ex. 102.

129. Citri-Lite does not challenge the commercial

reasonableness of Cott's efforts in marketing Slim-Lite at Wal-

Mart and concedes that Cott's efforts regarding the rollout

demonstrated Cott's financial and marketing support for Slim-

Lite. Trial Tr. 548:4-7, July 6, 2011 (Horrigan).

130. Citri-Lite contends, however, that Cott's marketing at

Wal-Mart is not a reasonable basis by which promotional decisions

at Sam's Club should be evaluated because demos were not a common

way to promote products at Wal-Mart. Trial Tr. 1236:12-17, July

12, 2011 (Nichol).

131. Although Wal-Mart and Sam's Clubs employ different

retail sales structures, no reasonable business would ignore the

results of a similar marketing strategy for the Sam's product

implemented by the world's largest retailer. Sam's Club buyer Mr. Dragovich opined that when making a distribution decision, buyers "look to see how Wal-Mart performed on it [the product] if they carried that item." Trial Tr. 1485:21-22, July 19, 2011.

     5)   <u>Cott's Alleged Inconsistent and Dishonest Communication with Citri-Lite and the Decline of the Agreement.</u>

132. Citri-Lite outsourced all manufacturing, sales, and distribution to Cott via their Agreement.

133. There is no provision in the Agreement that requires a certain level or quality of communication between Cott and Citri-Lite.

134. Mr. Horrigan's emails to Cott do not express concerns regarding a lack of communication.

135. Mr. Horrigan was aware and agreed in December 2004 to reallocate at least a portion of the marketing allowance to marketing endeavors other than demos. Joint Ex. 55.

136. In a January 3, 2005 email to Mr. Horrigan, Mr. Calise described several efforts "aimed at solidifying long-term distribution of Slim-Lite in SAMS Club and Wal-Mart," including "launching a 16.9oz line extension to better align with category trends," and "increasing promotion/demo activity." Joint Ex. 56.

137. Consistent with Mr. Calise's email:

     a.   Cott had already launched a 16.9-ounce size bottle and case for Slim-Lite at Wal-Mart in conjunction with the nationwide rollout of the product. *See e.g.*, Joint Ex. 100.

34

1

2

       b.   Cott was also strategizing a Slim-Lite bottle change at Sam's Club during this time.

3

4

       c.   On January 6, 2005 Cott ran a demo of Slim-Lite at all 1,500 Wal-Mart Supercenters. Joint Ex. 65.

5

6

7

8

9

       d.   Cott ran demos of Slim-Lite at all Sam's Clubs twice in January 2005. Trial Tr. 1079:19-24, July 12, 2011 (Bucklin); see also Joint Ex. 20 (showing Slim-Lite sold between 491 and 508 Sam's Clubs in January 2005).

10

11

12

       e.   In January 2005, Cott ran approximately 2,500 demos of Slim-Lite at Wal-Mart and Sam's Club, consistent with an increase in promotion/demo activity.

13

14

15

16

17

18

19

20

21

22

23

138. Cott's internal communications in early 2005 were not coordinated, creating an impediment to providing clear and accurate information and/or a desire for Cott to wait to communicate with Citri-Lite regarding the status of distribution and marketing. This is not evidence of an intention to deceive Citri-Lite regarding Cott's plans. Trial Tr. 258:5-12, July 1, 2011 (Horrigan agreeing that there could have been a "right-hand, left-hand situation[] at Cott. . . The people I dealt with individually [at Cott] were decent people.")

24

25

139. This evidence shows that the parties had a good faith relationship in their dealings with each other.

26

27

140. Citri-Lite received indications that by mid-2005, demos were no longer taking place. *See, e.g.*, Joint Ex. 21. Similarly,

28

Mr. Schiederer had discussions with Mr. Horrigan about the demo program being cut back. Trial Tr. 1223:18-25, July 12, 2011 (Schiederer). The reduction of demos was not hidden from Critri-Lite.

### a.   Cott's "Exit Strategy."

141. In May 2005, Doreen Gormley of Cott prepared an internal e-mail to multiple Cott employees and officers, noting that two Cott officers had agreed to implement an exit strategy for Slim-Lite focused on depleting the existing raw materials of Slim-Lite. Pl.'s Ex. 215 (May 23, 2005 e-mail).

142. Throughout 2005, nonetheless, Cott continued to pursue the packaging change for Slim-Lite at Sam's Club, to a 24-pack of 16.9-ounce bottles with registered wrap, which is inconsistent with an alleged strategy focused solely on exhausting the existing raw materials for Slim-Lite.

143. Cott's Bentonville employees continued to pursue both Sam's Club and Wal-Mart on behalf of Slim-Lite after May 2005. *See, e.g.*, Trial Tr. 1511:19-1512:19, July 19, 2011 (Mr. De La Cruz testified that in May and June of 2005 he had three to four discussions with Wal-Mart to try to keep Slim-Lite viable at Wal-Mart.)

144. In a June 10, 2005 conference call, Cott informed Mr. Horrigan of its plan to set up a meeting with Ms. Fields "to move beyond Jim Dragovich." Joint Ex. 42. Mr. Horrigan did not object

36

to Cott's approach. Trial Tr. 650:24-651:22, July 7, 2011 (Horrigan).

145. Mr. Schiederer "was still pushing" Slim-Lite as of August 2005. Trial Tr. 1228:25-1229:8, July 12, 2011 (Schiederer).

146. In October 2005, Cott notified Citri-Lite that it was exercising its contractual right to terminate the Agreement at the end of the two-year term, effective December 31, 2005. SUF No. 34.

147. On October 28, 2005, Citri-Lite notified Cott that it was unable to find a packer that could handle packaging of Slim-Lite after the Agreement ended. Joint Ex. 147.

148. Cott in good faith continued to produce and package Slim-Lite after December 31, 2005 into 2006 from its remaining inventory of raw materials to assist Citri-Lite. SUF No. 38.

149. Mr. Bucklin opined that Cott's internal communications regarding a focus on depleting raw materials in mid-2005 did not undermine his analysis that Cott was acting reasonably in its effort to promote and market Slim-Lite. In mid-2005, Cott worked with Ms. Fields, obtained additional distribution of Slim-Lite at Sam's Club, and continued to pursue Wal-Mart to try and restore the presence of Slim-Lite there. Tr. 1116:18-1118:16, July 12, 2011 (Bucklin).

      6)   <u>Mr. Bucklin's Assessment of the "Four Ps."</u>

150. Academics and analysts in the marketing field use a framework known as the "Four Ps" in assessing marketing efforts. The "Four Ps" are: (1) product, meaning the attributes of the product, its packaging, and its labeling; (2) price; (3) place, meaning the distribution and availability of the product; and (4) promotion, which includes promoting and advertising of the product. Tr. 1048:5-1049:8, 1051:2-5, July 12, 2011 (Bucklin). The boundaries between the "Four Ps" are not rigid, and a marketing action can overlap between multiple factors. Tr. 1053:12-18, July 12, 2011 (Bucklin).

151. Mr. Horrigan agreed that these factors are all legitimate considerations when marketing a beverage. Tr. 349:24-350:19, July 6, 2011.

152. Applying the "Four Ps" framework, Mr. Bucklin concluded that Cott's marketing efforts were reasonable across all of the "Four Ps."

a.   Promotion.

153. Mr. Bucklin has analyzed the effect of promotional efforts across multiple retail settings and goods over the years. He concluded that Cott's decisions to reduce and then cancel demos at Sam's were reasonable in light of their ineffectiveness and high costs.

154. Mr. Bucklin similarly concluded that Cott's promotional efforts at Wal-Mart and Food Lion were appropriate and reasonable

38

from a marketing perspective.

        a.   At Wal-Mart, Cott ran demos in conjunction with the nationwide roll-out.

        b.   At Food Lion, Cott did not run in-store promotional efforts, but did run a print advertisement, and gained distribution without the need for in-store promotions. Tr. 1077:14-1079:7, July 12, 2011.

        b.   <u>Place.</u>

    155. Mr. Bucklin concluded that Cott's efforts adequately addressed the "place" factor. Cott pursued a strategy focused on Sam's Club and Wal-Mart, both nationwide retailers, while also contacting other retailers. Tr. 1082:6-21, 1083:2-11, July 12, 2011. Citri-Lite knew that Cott's primary marketing focus would be on Sam's Club and Wal-Mart, and did not object to the approach. Joint Ex. 56 (Jan. 3, 2005 e-mail noting Cott's intent to "concentrate on activities that will help ensure the success of Slim-Lite within Walmart and SAMS," and Mr. Horrigan's response not objecting to approach.

    156. Cott achieved increased distribution at Sam's Club.

    157. Cott's pursuit of Wal-Mart in 2004 was reasonable, in light of the parties' shared goal of pursuing Wal-Mart, cross-ownership between Wal-Mart and Sam's and the fact that Wal-Mart is the largest retailer in the nation. Tr. 1086:4-7, 1086:22-1087:11, July 12, 2011.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

158. Mr. Carson raised the possibility that the efforts at Wal-Mart could have been "at the expense" of Cott's efforts at Sam's. Tr. 995:9-14, 908:9-18, July 8, 2011.

159. Mr. Bucklin testified that, contrary to Mr. Carson's speculation, Cott's nationwide rollout of Slim-Lite at Wal-Mart in 2005 did not endanger the brand's presence at Sam's Club. The Wal-Mart rollout could potentially strengthen Slim-Lite's position at Sam's Club due to the corporate overlap and relationship between Sam's Club and Wal-Mart. Also, in light of the magnitude of the opportunity presented by Wal-Mart and the competitive beverage environment in 2005, it was reasonable to seize upon an opportunity to obtain a competitive foothold there. Tr. 1088:22-1090:6, July 12, 2011.

160. As of the July 2004 business review meeting, Cott had approached sixteen additional retailers regarding Slim-Lite. Joint Ex. 154.6 (listing retailers approached and responses). None accepted Slim-Lite. Mr. Bucklin testified it was reasonable for Cott to pursue these retailers, even if they did not accept Slim-Lite as a product. Tr. 1083:15-1084:3, July 12, 2011.

161. Mr. Thompson of Cott approached four additional retailers beyond the sixteen listed in the July 2004 business review regarding Slim-Lite, specifically Lowes Foods, Ingle's, Southern Beverage, and The Pantry. Thompson Dep., 81:16-82:4. While unsuccessful, these attempts represented further reasonable

**40**

marketing efforts on Cott's part.

### c.   <u>Price.</u>

162. Mr. Bucklin concluded that Cott's efforts in connection with Slim-Lite's price were reasonable.

163. Cott implemented a price reduction to obtain full distribution at Sam's Club. Tr. 1097:4-11, 1101:13-17, July 12, 2011.

164. At Food Lion, Cott's pricing actions in maintaining an everyday low price, in conjunction with MVP price promotions, were reasonable. Tr. 1102:16-1103:13, July 12, 2011.

165. Cott's pricing actions at Wal-Mart were also reasonable according to Mr. Bucklin, as Cott worked with the Wal-Mart buyer to set the ultimate retail price, which remained within Wal-Mart's control. Tr.1104:21-1105:6, July 12, 2011.

### d.   <u>Product.</u>

166. Mr. Bucklin concluded that Cott's efforts with respect to "product" (which includes packaging) were reasonable. Tr. 1107:5-18, July 12, 2011.

167. Cott implemented a change to a 16.9-ounce bottle at Wal-Mart, and it was appropriate for Cott to consider the failure at Wal-Mart, as well as the costs of a bottle change, in determining whether to proceed with a packaging change at Sam's Club. Tr. 1108:19-1110:13, July 12, 2011.

168. It was also reasonable for Cott to reassess its plan to

implement a packaging change at Sam's Club in April 2005, in

light of: Mr. Dragovich's cut in distribution; the change in

buyers, which required cooperation from the new buyer; and costs

of the packaging change. Tr. 1112:9-1113:10, 1114:1-7, 12-14,

1115:13-19, July 12, 2011.

III. <u>CONCLUSIONS OF LAW</u>

A.     <u>Breach of Contract Claim – Commercially Reasonable Efforts.</u>

1.     In California, "[a] cause of action for breach of

contract requires proof of the following elements: (1) existence

of the contract; (2) plaintiff's performance or excuse for

nonperformance of all terms and conditions it is was obligated to

performed; (3) defendant's breach; and (4) damages to plaintiff

as a result of the breach." *CDF Firefighters v. Maldonado*, 158

Cal. App. 4th 1226, 1239 (2008).

2.     "It is solely a judicial function to interpret a

written contract unless the interpretation turns upon the

credibility of extrinsic evidence, even when conflicting

inferences may be drawn from uncontroverted evidence." *Hess v.

Ford Motor Co.*, 27 Cal. 4th 516, 527 (2002) (internal quotation

marks omitted). "When no extrinsic evidence is introduced, or

when the competent extrinsic evidence is not in conflict, the . .

. court independently construes the contract." *Founding Members*,

109 Cal. App. 4th at 955.

3.     "The fundamental goal of contractual interpretation is

1
2
3
4
5
6
7
8
9
10

to give effect to the mutual intention of the parties." *Bank of the W. v. Superior Court*, 2 Cal. 4th. 1254, 1264 (1992). "When a contract is reduced to writing, the parties' intention is determined from the writing alone, if possible." *Founding Members of the Newport Beach Country Club v. Newport Beach Country Club, Inc.*, 109 Cal. App. 4th 944, 955 (2003). "Unless the parties have indicated a special meaning, the contract's words are to be understood in their ordinary and popular sense." *Crawford v. Weather Shield Mfg., Inc.*, 44 Cal.4th 541, 552 (2008).

11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27

    4.   "If a contract is capable of two different reasonable interpretations, the contract is ambiguous." *Oceanside 84, Ltd. v. Fidelity Fed. Bank*, 56 Cal. App. 4th 1441, 1448 (1997); *see also Cal. Nat'l Bank. v. Woodbridge Plaza LLC*, 164 Cal. App. 4th 137, 143-44 (2008) ("An ambiguity exists when a party can identify an alternative, semantically reasonable, candidate of meaning of a writing.") (internal quotation marks omitted). "The fact that a term is not defined in the [contract] does not make it ambiguous." *Muzzi v. Bel Air Mart*, 171 Cal. App. 4th 456, 462-63 (2009) (alteration in original) (internal quotation marks omitted). "Nor does [d]isagreement concerning the meaning of a phrase, or the fact that a word or phrase isolated from its context is susceptible of more than one meaning." *Id.* (alteration in original) (internal quotation marks omitted). "[L]anguage in a contract must be construed in the context of that instrument as a

28

whole, and in the circumstances of that case, and cannot be found to be ambiguous in the abstract." *Powerline Oil Co., Inc. v. Superior Court*, 37 Cal. 4th 377, 391 (2005) (internal quotation marks omitted).

5.    Whether a contract is ambiguous can be determined from the face of the contractual language or from extrinsic evidence of the parties' intent. *Oceanside 84, Ltd.*, 56 Cal. App. 4th at 1448; *Supervalu, Inc. v. Wexford Underwriting Managers, Inc.*, 175 Cal. App. 4th 64, 74 (2009). Under the latter approach, "[i]f the trial court decides, after receiving the extrinsic evidence, the language of the contract is reasonably susceptible to the interpretation urged, the evidence is admitted to aid in interpreting the contract." *Founding Members*, 109 Cal. App. 4th at 955.

6.    The dispute here centers around whether Cott breached the Agreement by failing to engage in "commercially reasonable efforts to promote and sell" Slim-Lite, pursuant to Section 2.4 of the Agreement. Specifically, Citri-Lite alleges that Cott breached the Agreement in three material respects by: (1) cancelling demos of Slim-Lite at Sam's Club in 2005; (2) failing to implement a packaging change to create a 24-pack case of 16.9-ounce bottles at Sam's Club; and (3) failing to run sufficient price promotions at Food Lion or meeting in person with the Crossmark broker.

1        **1)    Commercially Reasonable Efforts.**

2        7.    There is no settled or universally accepted definition

3    of the term "commercially reasonable efforts." Plaintiff defines

4    "commercially reasonable" as a transaction conducted in good

5    faith and in accordance with commonly accepted commercial

6    practice. Defendant correctly points out that the limited case

7    law regarding the meaning of "commercially reasonable efforts" is

8    consistent with the principle that commercial practices by

9    themselves provide too narrow a definition and that the

10   performing party may consider its own economic business interests

11   in rendering performance.

12       8.    While industry standards are instructive as to whether

13   the defendant acted with commercial reasonableness, there must be

14   a subjective evaluation as well because "[n]o business would

15   agree to perform to its detriment." *Lemond Cycling Inc. v. PTI*

16   *Holding, Inc.*, No. Civ.03-5441 PAM/RLE, 2005 WL 102969, at * 5

17   (D. Minn. Jan. 14, 2005). Both parties cite *Microboard*

18   *Processing, Inc. v. Crestron Elec., Inc.*, which states that the

19   term "commercially reasonable efforts" requires a consideration

20   of the totality of the business relationship, including the

21   financial resources, business expertise, and practices of [the

22   defendant]. Civil No. 3:09cv708 (JBA), 2011 WL 1213177, at *3 (D.

23   Conn. Mar. 29, 2011) (*citing Lemond Cycling*, 2005 WL 102969 at

24   *5). "[W]hether and how compliance with the 'industry standards'.

25

26

27

28

. . . relates to [] "commercial reasonableness". . . must also take into account factors" such as the skills and costs associated with conforming to industry standards, as well as the relative efficacy of those standards. *Microboard Processing*, 2011 WL 1213177, at *3; *see also Metavante Corp.*, 619 F.3d at 766 ("The obligations of the parties to perform the terms of a contract must be evaluated in the context of the totality of the business arrangement contemplated by the contract."). Marketing efforts and costs involve the totality of the business relationship.

9.    "[C]ommercially reasonable efforts. . . cannot be established simply by observing, in hindsight, that [the defendant] could have done something differently that would have produced a better result." *Bear Stearns Funding, Inc. v. Interface Group-Nevada, Inc.*, No. 03 Civ. 8259(CSH), 2007 WL 1988150, at *3 (S.D.N.Y. July 10, 2007).

2)    <u>General Conclusion Re: Marketing.</u>

10.    Marketing is not so narrowly defined as to include only promotions and/or demos; it can include, *inter alia*, price reductions, increased distribution, selling the product wholesale in order to comply with an "everyday low price" strategy and/or a combination of any and all of the above. *See, e.g.*, Trial Tr. 349:24-350:19, July 12, 2011 (Horrigan agreeing that packaging, price, distribution and availability of the product, as well as promotion are all legitimate considerations in aspects of

46

marketing a beverage); *see* Black's Law Dictionary (9th ed. 2009)
(defining marketing broadly as "[t]he part of a business
concerned with meeting customers' needs.")

11.  Plaintiff has not realistically recognized that Cott
spent at least a million dollars in time, effort, and out of
pocket expense to market Slim-Lite.

12.  Cott engaged in every marketing method and packaging
design Plaintiff has identified.

13.  Plaintiff is unwilling to recognize or accept that the
objective market did not ultimately accept and reward the product
with commercial success.

3)  <u>General Conclusion Re: the Agreement.</u>

14.  Plaintiff emphasizes its sales volume reaching 700,000
cases in 2003, the year prior to Slim-Lite's assignment to Cott.
However, the net profit on those sales for 2003 was not as much
as the annual royalty of $350,000 per year that Cott was
committed to pay whether or not Cott sold a single case of Slim-
Lite case in a given year. Tr. 390:18-20, July 6, 2011
(Horrigan). This guaranteed royalty payment afforded substantial
protection for Citri-Lite assuming *arguendo* "the product was
ignored and sales [took] a major drop." Joint Ex. 146. Slim-Lite
did not create profits to offset against those costs.

47

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

    4)    Cancellation of Slim-Lite Demos at Sam's Clubs.

15.   The parties arrived at the 80 cent per case requirement by looking to the amount Ciri-Lite spent on demos at Sam's Club. The Agreement did not include any references to demos or obligations to perform a particular demo program at any specified level, despite Mr. Horrigan's sophistication and ability to include, if he believed it was necessary, an express contract term for a specific demo program defined by number of cases. This would have provided performance parameters to measure the success and extent of Cott's marketing efforts. Plaintiff did not do so.

16.   Having imposed the 80 cent per case marketing obligation upon Citri-Lite's demo efforts, that term quantifies the intent as to the extent of Cott's demo obligation without the inclusion of a demo or case sales standard.

17.   Citri-Lite does not dispute that Cott satisfied the 80 cent per case marketing requirement over the entire life of the Agreement, which undermines its claims of breach based upon Cott's cancellation of demos.

18.   Citri-Lite does not dispute that Cott paid the $350,000.00 royalty payment each year under the contract.

19.   Applying the "commercially reasonable efforts" standard, Cott's decision to exercise its unconditional termination right was reasonable in light of the totality of the business relationship and the product's failure to achieve sales

48

success in about one and a half years of active marketing by Cott.

20.  The evidence demonstrates that demos were costly to Cott.  Woods testified that the demos essentially resulted in Cott "buying volume" due to their high cost. Mr. Bucklin's regression analyses demonstrated that demos only created a sales lift of approximately twelve cases, and that Cott's contribution margin on those cases was dwarfed by the demo costs.

21.  The evidence demonstrates that demos were not effective at increasing long-term sales of Slim-Lite at Sam's Club.[9] Both Mr. Schiederer and Mr. Woods noted that sales increased only during the week of the demos, without creating any sustained increase in sales. The regression analysis corroborates this and quantitatively establishes that demos did not increase sales in any weeks after the demo.

22.  The 1,500 demos run at Wal-Mart supercenters in January 2005, at a cost to Cott of roughly $150,000.00, also failed to increase sales.

23.  Finally, Cott reasonably considered the pending buyer change from Mr. Dragovich to Ms. Fields in making decisions regarding demos. Ms. Fields did not require products in her

_____

[9] Citri-Lite admitted that it never performed any statistical or quantitative analysis to determine whether its demo program actually generated long-term sales, instead relying solely on Mr. Horrigan's "feeling" that it did. Trial Tr. 361:18-23, July 6, 2011 (Horrigan). This is insufficient to overcome Cott's quantitative evidentiary showing that demos were not effective during the Agreement period.

category to demo and stated that "plenty" of products in her category did not demo. Cott was not unreasonable in being cognizant of the new buyer's preferences as to demos.

24.   Despite the high cost of demos and their ineffectiveness, Citri-Lite contends that Cott should not have decreased demoing when distribution was increased because demos were the "only" significant means of promotion available at Sam's Club.

25.   Citri-Lite takes a singularly-focused and overly narrow view of the scope of marketing approaches. That Cott increased distribution to over 500 Sam's Club stores nationwide is a noteworthy positive marketing achievement in itself. Cott also attempted in good faith to implement a retail price reduction which was expected to increase sales by ten percent. Part of the $0.80 per case marketing budget was used to implement the $0.24 per case price reduction, which necessarily reduced the amount of money allocated to demos. Despite this and the costliness of demos, Cott continued to spend money demoing the product, including twice a month in January 2005. Cott was also working and spending money on a packaging change for Slim-Lite.

26.   Under the totality of the facts, Citri-Lite has not proved that Cott's decision to cancel demos at Sam's Club was a breach of its obligation to use "commercially reasonable" marketing efforts. The evidence in this case based on actual

1  sales performance is that demos did not drive long-term sales.

2  The costs of demos were disproportionate to the small increase in

3  sales generated during demo weeks. Demos did not succeed in

4  generating sales at Wal-Mart. Finally, Sam's Club was

5  transitioning to a new buyer who, through no fault of Cott, did

6  not require nor encourage demos, and Cott simultaneously pursued

7  marketing alternatives to demos at Sam's Club. Cott's conduct

8  with regard to cancelling demos was commercially reasonable.

9      27.  Cott did not breach any term of the license Agreement

10 in its effort to, expenditure on, and use of demos.

11
12     5)   Packaging Changes at Sam's Club.

13     28.  The parties do not dispute that Cott pursued a

14 requested packaging change for Slim-Lite at Sam's Club. Citri-

15 Lite claims that Cott was commercially unreasonable in failing to

16 implement the packaging change. When viewed under the totality of

17 the circumstances, the fact that Cott did not implement the

18 packaging change did not breach its obligation to use

19 "commercially reasonable efforts" to market Slim-Lite.

20     29.  Mr. Dragovich suggested a packaging change to Cott

21 around the fall of 2004.

22     30.  The implementation of a packaging change was a multi-

23 stage process, which would have resulted in a completely new cost

24 structure for Slim-Lite and investment in capital assets and

25 equipment.

31.  During the term of the Agreement, Cott bore all the costs of a packaging change. Cott was justified in considering the economic feasibility of these costs in relation to net sales revenues and what effect they had on improving Slim-Lite's sales.

32.  Both parties agree that approval of the Sam's Club buyer was necessary before a packaging change could proceed.

33.  Cott learned in February 2005 of the impending buyer change from Mr. Dragovich to Ms. Fields. It was reasonable for Cott to reassess the packaging change in light of the new buyer's requirements.[10] *See, e.g.*, Trial Tr. 453:8-10, July 6, 2011 (Horrigan agreeing that it was "reasonable to consider the buyer's views in connection with a possible packaging change.")

34.  The buyer transition took months longer than expected, for reasons unknown to Cott and through no fault of Cott.

35.  A final design was not approved by Ms. Fields until November 2005, a month after Cott notified Citri-Lite of its desire to terminate the Agreement.

---

[10] Citri-Lite argues that a change should have been made under Mr. Dragovich's tenure as buyer, but this "20/20" vision of hindsight does not make Cott's conduct commercially unreasonable. Vision of a better outcome may have occurred – i.e., the bottle change may have been implemented and sales may have increased - if the change had taken place while Mr. Dragovich was the buyer, but this theory is speculative. Further, given that Mr. Horrigan agreed that receiving approval from the buyer is reasonable and that (1) notice of a buyer change took place around the same time that a bottle reconfiguration was being contemplated; (2) a bottle change takes months to execute, which necessarily meant Ms. Field's approval not Mr. Mr. Dragovich's was necessary; and (3) the buyer change took longer than expected at no fault of Cott, it is reasonable that Cott would wait to move forward with a bottle change until approved by Ms. Fields and not Mr. Dragovich. While hypothetically, Slim-Lite's fate may have been different had Cott implemented the bottle change under Mr. Dragovich's tenure, that does not prove that Cott acted unreasonably under the undisputed circumstances.

36.   Citri-Lite has not established that Cott abandoned the packaging change process. Cott did not act unreasonably regarding the packaging change.

6)   <u>Cott's Conduct at Food Lion.</u>

37.   Citri-Lite contends that Cott's marketing efforts at Food Lion were not "commercially reasonable" for two reasons: (1) Cott should have met in person with the Crossmark broker regarding Slim-Lite; and (2) Cott should have run additional price promotions for Slim-Lite at Food Lion. The evidence presented does not establish either contention.

38.   Citri-Lite presented no evidence to explain how an in-person meeting with Mr. McGlothlin, rather than the many phone conversations that took place, would have led to increased Slim-Lite sales at Food Lion. Nor did Citri-Lite present evidence explaining how the lack of in-person meetings harmed Slim-Lite at Food Lion.[11] Mr. McGlothlin did not say that telephone contact instead of face-to-face meetings prejudiced Slim-Lite in any way. No one from Food Lion testified that personal meetings would have made any difference.

39.   Mr. McGlothlin and Mr. Thompson regularly did business over the phone regarding Slim-Lite. The evidence establishes that Cott achieved successes for Slim-Lite using that approach;

---

[11] Citri-Lite presented evidence that the lack of in-person meetings was not typical, but not commercially unreasonable because effective telephonic communication was maintained between Cott and Food Lion.

namely, an increase to full distribution at Food Lion, favorable placement of Slim-Lite at Food Lion, and two price promotions.

40.   Additionally, there is no evidence why Cott has any responsibility to initiate any in-person meetings, if communication was open. It is more reasonable to infer that Crossmark had the responsibility to set up in-person meetings if Crossmark believed they were necessary. Mr. McGlothlin had the relationship with Food Lion and Citri-Lite/Cott were Crossmark's clients, not vice versa. Cott had frequent and open communication with Food Lion.

41.   Citri-Lite's second contention that Cott should have run more price promotions, ignores: (1) the different marketing strategy Food Lion employed, (2) that Citri-Lite itself negotiated and agreed to the cost structure in order to meet this strategy, (3) Cott's marketing efforts at Food Lion, and (4) the additional costs of such efforts.

42.   It is undisputed that Citri-Lite negotiated the $10.20 per case wholesale price in conjunction with Food Lion's marketing strategy of an "everyday low price." This price structure left no margin for additional marketing consideration.

43.   Citri-Lite's agreement to sell Slim-Lite at wholesale, in practicality, used much or all of the marketing allocation to meet Food Lion's marketing-strategy price. Citri-Lite cannot have reasonably expected Cott to incur additional marketing costs by

running promotions[12] when there were little resources to do so.

44.  Cott nevertheless ran two "MVP" price promotions, which did not appear to generate repeat purchasers.

45.  Cott also achieved favorable shelf placement of Slim-Lite at Food Lion.

46.  It was reasonable for Cott not to run further "MVP" promotions, given their cost, their lack of success, and an alternative marketing strategy focused on everyday low price and favorable shelf placement.

47.  If the product had merit, it would have succeeded in the market.

B.   Breach of the Implied Covenant of Good Faith and Fair Dealing.

48.  Every contract contains an implied covenant of good faith and fair dealing providing that no party to a contract will do anything that would deprive the other contracting party of the benefits of the contract. *Digerati Holdings, LLC v. Young Money Entm't, LLC*, 194 Cal.App.4th 873, 885 (2011) (*citing Wilson v. 21st Century Ins. Co.*, 42 Cal.4th 713, 720 (2007)). The implied covenant protects the reasonable expectations of the contracting parties based on their mutual promises. *Carma Developers (Cal.), Inc. v. Marathon Dev. Cal., Inc.* 2 Cal.4th 342, 373–374 (1992); *Careau & Co. v. Sec. Pac. Business Credit, Inc.*, 222 Cal.App.3d

---

[12] During this time, Cott was also spending over the 80 cent allocation on demos at Sam's Club.

1371, 1395 (1990).

49.   A breach of the implied covenant requires something more than a breach of the contractual duty itself. *Careau & Co.*, 222 Cal.App.3d at 1394 (citations omitted).  This "implies unfair dealing rather than mistaken judgment." *Id*.

50.   Citri-Lite contends that the implied covenant was breached because (1) Cott was preoccupied with the pursuit of its other "core business" and (2) Cott misled Citri-Lite concerning its intentions.

1)   <u>Citri-Lite's "Preoccupation" Clam.</u>

51.   Citri-Lite cites *Marsu, B.V. v. The Walt Disney Co.*, 185 F.3d 932 (9th Cir. 1999), to assert its "preoccupation" claim. In *Marsu*, defendant Disney was held liable for breach of the implied covenant in connection with its marketing efforts under a licensing agreement involving a cartoon character.

52.   *Marsu* found Disney breached the implied covenant by (1) employing junior and inexperienced employees to market the licensed product; (2) mistiming the marketing campaign for the character, running it when no television shows featured the character; and (3) because a high-ranking Disney employee circulated a memo to the CEO noting that the company had "neither the time nor resources to do Marsu right. . . . we have lots of other Disney priorities, more important both financially and strategically." 185 F.3d at 937.

56

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

53.   *Marsu* is distinguishable. Unlike Disney, Cott employed a number of experienced, qualified employees as officers to market Slim-Lite to its key retailers. Mr. Schiederer had previously sold beverages to Sam's Club, and had a pre-existing relationship with Ms. Fields, the incoming Sam's Club buyer. Cott employed Mr. De La Cruz, who had been Cott's key Wal-Mart contact since 2001, both as Account Manager and as Director of Sales.

54.   There is also no parallel between this case and *Marsu* regarding the timing of Cott's marketing efforts, specifically in light of Cott's actions in January 2005, months <u>after</u> the October 2004 timeframe when Citri-Lite alleges Cott began to "mislead" it regarding demos and promotions. January is viewed as "diet month" in the beverage industry and a favorable time to market Slim-Lite. Cott orchestrated a nationwide roll-out of Slim-Lite at Wal-Mart at this key time. Cott ran approximately 2,500 demos of Slim-Lite in January 2005 at Sam's Club and Wal-Mart and spent over $150,000 on demos. This evidence demonstrates that Cott timed its marketing efforts to <u>maximize</u> their effect to support Slim-Lite sales.

55.   Finally, unlike the situation in *Marsu*, in which the plaintiff produced a "smoking gun" memorandum to the CEO which expressly stated that Disney would ignore Marsu in favor of other projects, Cott has shown its continued commitment to selling and marketing Slim-Lite throughout 2004 and much of 2005 which only

57

ceased when it no longer made reasonable business sense to continue marketing efforts for Slim-Lite.

    2)   <u>Communication Between Cott and Citri-Lite.</u>

56.  Citri-Lite cites a footnote from *Floystrup v. City of Berkeley Rent*, 219 Cal.App.3d 1309, 1319 n.8 (1990) which states that "[s]ubterfuges and evasions violate the obligation of good faith." The evidence does not reflect that Cott was acting dishonestly or in a devious manner.

57.  Citri-Lite cites no case law or contract language which requires that Cott maintain a defined level or frequency of communication with Citri-Lite.

58.  Citri-Lite could have included reporting and frequency of communication requirements for Cott as part of the licensing Agreement, yet did not.

59.  Citri-Lite asserts that in October 2004, Cott's management made a decision to focus its efforts on producing carbonated soft drinks, but led Citri-Lite to believe that it was still interested in promoting Slim-Lite.

60.  Although Cott's managers requested a shift in Cott's focus to carbonated drinks in the October 2004 meeting, Cott did not discontinue its marketing efforts and expenditures regarding Citri-Lite. Cott's communications with Citri-Lite were honest. In December 2004, for example, Cott requested that the marketing funds be partially or wholly reallocated to a price reduction

instead of demoing. This request informed Mr. Horrigan that Cott was moving away from demos, but was willing to try a different marketing strategy which eventually succeeded in gaining Slim-Lite national distribution at Sam's Club.

61.  Citri-Lite cites as deceptive a January 3, 2005 email from Cott to Mr. Horrigan regarding the "major initiative" to launch a 16.9 ounce bottle at Sam's Club. However, at that time the evidence demonstrates that Cott *was* making preparations to and was seriously considering implementing a new bottle size when it gained the approval of the buyer.

62.  In early 2005, Cott's internal communications demonstrated a lack of coordination within the company. Cott states that it was waiting until it had complete and accurate information about the Sam's Club situation and personnel before contacting Citri-Lite about the status and its plans for regaining distribution. No evidence contradicts this.

63.  Cott was in the dark itself regarding information from Sam's Club between April 2005 and June 2005. Mr. Dragovich had cut distribution without warning and the buyer transition was delayed without any explanation to Cott.

64.  Cott further presented evidence that it maintained its commitment to marketing and selling Slim-Lite and effecting a packaging change until termination of the contract, despite its purported change in focus to sell private label brands and sell

1   off Slim-Lite's raw materials.

2       65.   Citri-Lite cites no legal authority to support that

3   Cott was required to maintain a certain level of communication.

4   The evidence presented does not show that Cott was acting in an

5   evasive manner.[13] Cott presented information to Citri-Lite as Cott

6   received it, and involved Mr. Horrigan in its marketing decisions

7   despite Citri-Lite's assignment to Cott of the exclusive right to

8   manufacture, produce, distribute, sell and market Slim-Lite.

9   Cott's level and quality of communication with Citri-Lite does

10  not constitute a breach of the implied covenant.

11
12  C.    Conclusion.

13      66.   This case is ultimately about an unconditionally

14  terminable at-will agreement that gives meaning to the adage

15  "nothing lasts forever." Citri-Lite and Cott did not "get married

16  until death due them part." Each of them was commercially

17  sophisticated and entered into the Agreement with knowledge of

18  the risk that marketing of Slim-Lite might not succeed.

19      67.   Citri-Lite loses sight of the contractual reality of

20  this case. The enforceable life expectancy of the contract was

21  sixty days after notice of termination for any reason and without

22  cause. Neither party had any reasonable expectation that the

23  contract could extend beyond sixty days after notice of

24
25
26
27  ─────────────────
    [13] Mr. Horrigan himself agreed with this. Trial Tr. 257:15-258:12, July 1, 2011
28  (agreeing that Cott's allegedly inconsistent communications could be a "right
    hand, left hand" problem, as opposed to something evasive.)

termination or two years, whichever came first. Although it is unnecessary to discuss damages, it is largely impermissible to project damages beyond the temporal, very limited term of a contract that can be unconditionally terminated on sixty days notice. There was neither a legal or factual basis for projecting lost profit damages over future years.

68.   The evidence establishes that the parties contracted to have Slim-Lite brought to market for two years, but if for any reason either party was dissatisfied with anything about their business relationship, it was over after sixty days notice at the election of either.

69.   The parties' voluminous and overly-detailed proposed findings and conclusions which focus on every minute aspect of this action have been fully considered.

70.   To the extent any finding of fact can be interpreted as a conclusion of law or the converse, it is so intended.

71.   Cott acted in a commercially reasonable manner in its marketing efforts and performed all terms, covenants and conditions of the licensing Agreement on its part to be performed. There was no breach.

72.   Mr. Horrigan was extremely experienced, knowledgeable and sophisticated in beverage production and marketing. He could have asked for performance standards, sales goals, defined intervals, and any other monitoring performance provisions. He

did not. He assigned full control of the marketing, sales and production to Cott in light of his expertise and knowledge.

73.   The license Agreement between Cott and Slim-Lite was not a guarantee of the marketing and commercial success of Slim-Lite. Cott spent substantial money, time, and effort on its endeavors to market Slim-Lite. Cott made a good faith and reasonable effort to market the product and support Citri-Lite even beyond the end of the parties' Agreement.

74.   Cott is not liable to Citri-Lite and is entitled to judgment in its favor against Citri-Lite on all claims.

IV. <u>ORDER.</u>

For the reasons stated, it is ORDERED:

1.   Defendant Cott is not liable to Plaintiff Citri-Lite for any claims asserted and Defendant is entitled to judgment against Plaintiff on all claims.

2.   Defendant Cott has established by a preponderance of the evidence that it acted with justification and was privileged to protect its economic interest.

3.   Cott shall recover its costs of suit in accordance with the requirements of law.

4.   Separate form of judgment consistent with these findings is simultaneously entered.

1    SO ORDERED.

2    DATED: September 30, 2011.

3                                    /s/ Oliver W. Wanger
                                      Oliver W. Wanger
4                             United States District Judge

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28
                                     63